[No. 48914-9. En Banc. May 17, 1984.]

WASHINGTON FEDERATION OF STATE EMPLOYEES, AFL–CIO, COUNCIL 28, AFSCME, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Douglas P. Wyckoff* (of *Cordes, Younglove & Wyckoff*), *Richard D. Eadie* (of *Eadie & Quirk*), *Mark S. Lyon* and *Richard H. Robblee* (of *Hafer, Cassidy & Price*), for appellants.

*Kenneth O. Eikenberry, Attorney General, Richard A. Heath, Senior Assistant,* and *Donald F. Cofer, Assistant,* for respondents.

DOLLIVER, J.—In 1982 the Washington Legislature amended the state civil service laws to permit performance as well as seniority to be considered in matters of compensation, reduction in force, and reemployment. Substitute

House Bill 1226, 47th Legislature (1982). The Governor approved Substitute House Bill 1226, except for section 30 and all references thereto. His veto message stated:

Section 30 calls for legislative review and approval of the proposed administrative rules for implementing the act. Failure of the legislature to approve the rules would void several sections of the act. In addition to presenting some constitutional issues relating to the functions of the legislative and executive branches, implementation of this section creates too much uncertainty as to when or whether the law will become effective.

Laws of 1982, 1st Ex. Sess., ch. 53, at 1511. Thereafter, plaintiff Washington Federation of State Employees, AFL–CIO, filed a complaint for declaratory judgment and injunction against defendants State of Washington; Governor Spellman; Higher Education Personnel Board, Douglas Sayan, Director; and State Personnel Board, Leonard Nord, Secretary.

The union alleged enactment of Laws of 1982, 1st Ex. Sess., ch. 53 would change the terms, rights, and benefits historically accorded to public employees under the state civil service law.

The challenged provisions of chapter 53 include:

1. Certification. The number of names referred to hiring authorities for vacancies, promotions, and reemployment from layoff is increased from two to four more names than there are vacancies to be filled. Sections 4(2) and 16(2).

2. Increment Salary Increases. Length of service (seniority) as the sole basis for awarding increment salary step increases is eliminated. Sections 4(18) and 16(18). Instead, employee performance evaluation standards will additionally be utilized to award salary increases. Sections 6, 8, and 21.

3. Layoffs. Reduction in force is no longer based solely upon seniority. The decision is now also founded upon an employee's performance. Sections 7 and 20.

4. Reemployment From Layoff. Rather than base reemployment on seniority, hiring authorities are also subject to

the expanded certification law. Sections 10 and 23.

The union maintained public employees covered by the state civil service and higher education personnel laws relied on established practices and regulations under existing laws which amounted to contract expectancies under Const. art. 1, § 23. The amendments were alleged to have impaired substantially their contract with the State and hence to be violative of the contract clause of Const. art. 1, § 23. Additionally, plaintiffs challenged the validity of Governor Spellman's veto of section 30. *See* Laws of 1982, 1st Ex. Sess., ch. 53, at 1510.

Motions for intervention were granted to the following plaintiff unions: Washington Public Employees Association; United Food and Commercial Workers, Local 1001; and International Federation of Professional and Technical Engineers, Local 17.

Plaintiffs moved for summary judgment and defendants cross–motioned. The Superior Court granted (1) defendants' motion for summary judgment upholding the constitutional validity of Laws of 1982, 1st Ex. Sess., ch. 53, and (2) plaintiffs' motion for summary judgment invalidating the Governor's affirmative veto of section 30. Both parties appealed. Pursuant to RAP 4.2, direct review was accepted.

I

CONTRACT CLAUSE

■ "No . . . law impairing the obligations of contracts shall ever be passed." Const. art. 1, § 23. This provision is substantially the same as U.S. Const. art. 1, § 10 and is to be given the same effect. *Ruano v. Spellman,* 81 Wn.2d 820, 825, 505 P.2d 447 (1973).

■ Generally, a statute is treated as a contract when the language and circumstances demonstrate a legislative intent to create rights of a contractual nature enforceable against the State. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n.14, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977).

The difficulty . . . has always been to distinguish what is intended by the legislature to be an exercise of its

ordinary legislative function in making laws, which, like other laws, are subject to its full control by future amendments and repeals, from what is intended to become a contract between the State and other parties when the terms of the statute have been accepted and acted upon by those parties.

Hale, *The Supreme Court and the Contract Clause: II,* 57 Harv. L. Rev. 621, 663–64 (1944) (quoting *New Jersey v. Yard,* 95 U.S. 104, 114, 24 L. Ed. 352 (1877)). *See Aetna Life Ins. Co. v. Washington Life & Disab. Ins. Guar. Ass'n,* 83 Wn.2d 523, 539, 520 P.2d 162 (1974). *Compare Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 104–05, 82 L. Ed. 685, 58 S. Ct. 443, 113 A.L.R. 1482 (1938) (contract between teacher and school corporation evinced by the numerous uses of the word "contract" in the state act) *with Dodge v. Board of Educ.,* 302 U.S. 74, 78–79, 82 L. Ed. 57, 58 S. Ct. 98 (1937) (teacher compulsory retirement law did not create a contractual obligation as neither the language of the law nor the circumstances of its adoption evinced such a legislative intent).

Plaintiff unions contend the state civil service laws form the basis of a contractual relationship between the State and its public employees. These laws are alleged to form a "statutory contract" which is binding under Const. art. 1, § 23, through the promise of "deferred benefits" in return for the acceptance and continued employment of public employees. Moreover, the public employees' reliance on the State's statutory promises is claimed to invoke the doctrine of promissory estoppel. Restatement (Second) of Contracts § 90 (1981). Additionally, plaintiffs maintain the public employee pension cases, beginning with *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956), are analytically similar.

*Bakenhus* involved the modification of a pension statute, during the tenure of the plaintiff policeman, which would have deprived the officer of approximately one–third of his anticipated pension. *Bakenhus v. Seattle, supra* at 703. Affirming an increase in pension funds, we determined the

State's obligation to pay a pension was contractual in nature and vested at the time the employee entered public service. *Bakenhus v. Seattle, supra* at 698–70.

Subsequent cases have affirmed the *Bakenhus* holding. *See Washington Fed'n of State Employees Coun. 28 v. State,* 98 Wn.2d 677, 658 P.2d 634 (1983) (pension rights of public employees unconstitutionally impaired by statute preventing the inclusion of the value of accrued vacation time in computing pension benefits); *Horowitz v. Department of Retirement Sys.,* 96 Wn.2d 468, 635 P.2d 1078 (1981) (denial of refund of contributions to judicial retirement system due to contractual bar of pertinent statute); *Eagan v. Spellman,* 90 Wn.2d 248, 581 P.2d 1038 (1978) (a lowering of the mandatory retirement age after an employee commenced public service was invalidated as her potential pension was decreased from 28 percent to 18 percent of her average final compensation); *Washington Ass'n of Cy. Officials v. Washington Pub. Employees' Retirement Sys. Bd.,* 89 Wn.2d 729, 575 P.2d 230 (1978) (the practice of Public Employees' Retirement System to include lump sum termination payments in the computation of "average final compensation", which determines pension payments, held to be a contractual obligation).

Defendants argue the state civil service laws do not create a contract between the State and its employees. Relying principally upon *Association of Capitol Powerhouse Eng'rs v. State,* 89 Wn.2d 177, 570 P.2d 1042 (1977), defendants maintain:

> [T]he terms and conditions of public employment . . . are basically controlled by statute, not by contract . . . [as i]t is clearly within the province of the legislature to enact statutes regulating the "mode and appointment and tenure in public employment."

89 Wn.2d at 184 (quoting *Gogerty v. Department of Insts.,* 71 Wn.2d 1, 5, 426 P.2d 476 (1967)). *See Greig v. Metzler,* 33 Wn. App. 223, 230, 653 P.2d 1346 (1982).

Additionally, defendants limit the *Bakenhus* rule to "pension" cases and distinguish "tenure" cases. This dis-

tinction was clearly defined in *Eagan v. Spellman,* 90 Wn.2d 248, 581 P.2d 1038 (1978). The majority in *Eagan* found the lowering of the mandatory retirement age affected a pension right and therefore did not need to "question the ability of public employers to terminate their employees nor the tenure rights of such employees." 90 Wn.2d at 255. The dissent found the law to be a "regulation of a term of public employment (tenure) which is the unchallenged right of the county to exercise unilaterally . . . unrelated to the contract rights involved in a pension scheme." 90 Wn.2d at 263 (Horowitz, J., dissenting).

■ We adopt the defendants' position as the correct statement of the law. The rights challenged here are neither deferred benefits nor do they give rise to contractual expectancies. Rather, the affected provisions (certification, increment salary increases, layoffs, and reemployment from layoffs) are best categorized as terms of public employment (tenure) and part of a system of personnel administration. *Cf.* RCW 41.06.010; RCW 28B.16.010. Tenure is regulated by legislative policy. We affirm the judgment of the trial court that the 1982 amendments do not constitute impairment of contract.

## II
### GOVERNOR'S VETO

Plaintiffs challenge the Governor's veto principally on two grounds: (1) the veto is prohibited under Const. art. 3, § 12 (amend. 62) as an item veto; and (2) the veto is void as an "affirmative" rather than a "destructive" veto, *Washington Ass'n of Apartment Ass'ns v. Evans,* 88 Wn.2d 563, 564 P.2d 788 (1977). A third ground, argued without citation to authority, has no substance.

The trial court found plaintiffs' first contention to be without merit. In considering the second contention it recognized "the Governor's veto has elements that are at once affirmative and destructive." However, it concluded "the veto which we are here concerned was used affirmatively to create different legislation than that which was made cer-

tain by the provision of SHB 1226 prior to the veto . . . [and] must be declared invalid."

Defendants urge abolition of the affirmative–negative veto analysis claiming it has an inherent subjectivity which fosters uncertainty in the legislative process and which involves the judiciary in the exercise of legislative powers. Alternatively, defendants maintain Governor Spellman validly exercised his veto power.

### 1. Item Veto

Const. art. 3, § 12 (amend. 62) provides in part:

> If any bill presented to the governor contain[s] several sections or appropriation items, he may object to one or more sections or appropriation items while approving other portions of the bill: *Provided,* That he may not object to less than an entire section, except that if the section contain[s] one or more appropriation items he may object to any such appropriation item or items.

The intent of the Legislature in passing the measure is summarized in this colloquy:

> Senator Grant: ". . . It is intended by this measure to return the veto power to its status as of about 1959. That is the governor, of course, can veto an entire bill. . . . If an enactment is so structured in sections, he can veto entire sections of bills. The question now is the item veto and how that affects it. There would no longer be an item veto under this constitutional amendment, with the exception of appropriations amounts, that is less than a section. He can veto appropriations amounts out of a main budget bill or out of any bill that has an appropriation attached to it, but he cannot under this constitutional amendment, according to our caucus attorney, veto any less than a section; that is, language that is less than a section, except for the appropriation itself."
>
> Senator Lewis (Harry): "Senator Grant, a further question. In the event an appropriation bill had a proviso in it which proviso would be less than a full section, would you clarify the intent of this constitutional amendment as to the right of the governor to veto that proviso or an amount within the proviso or an amount indicated as part of the proviso?"
>
> Senator Grant: "It is my understanding and it is our

intent, the intent of the sponsors of this measure, that he could not veto less than an entire section, a proviso that was less than an entire section, except for the appropriations amount."

Senate Journal, 43d Legislature, 3d Ex. Sess. (1974), at 116. Thus, except for appropriations, the sixty–second amendment abolished the item veto in Washington. *See generally Washington Ass'n of Apartment Ass'ns v. Evans, supra; State ex rel. Ruoff v. Rosellini,* 55 Wn.2d 554, 348 P.2d 971 (1960); *Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 30 P.2d 976 (1934); Burke, *The Partial Veto Power: Legislation by the Governor,* 49 Wash. L. Rev. 603 (1974).

Const. art. 3, § 12 (amend. 62) also provides:

That within forty–five days next after the adjournment, Sundays excepted, the legislature may, upon petition by a two–thirds majority or more of the membership of each house, reconvene in extraordinary session, not to exceed five days duration, solely to reconsider any bills vetoed.

According to Senator Grant, the way the veto can be "gotten around" is to have "two–thirds [of the] members petition, call themselves back in for a veto session, if it really is contradictory to a two–thirds majority of the wishes of the members of the Senate." Senate Journal, *supra* at 89.

■ The veto of Governor Spellman was of an entire section and was valid. The deleted references to section 30 were incidentally vetoed purely as a ministerial act. If not deleted, the code reviser, pursuant to RCW 1.08.015(2)(m), would have taken out such "manifestly obsolete" references.

"In approving or disapproving legislation, the Governor acts in a legislative capacity and as part of the legislative branch of government." *Hallin v. Trent,* 94 Wn.2d 671, 677, 619 P.2d 357 (1980). In effect, the Governor holds one–third of the votes. The veto is upheld if the Legislature fails to override it. *Fain v. Chapman,* 94 Wn.2d 684, 688, 619 P.2d 353 (1980). To override the Governor's veto, the Senate and House must agree by a two–thirds vote. Const. art. 3, § 12 (amend. 62).

The Washington Legislature in 1983 passed Substitute House Bill 134, which restored much of the civil service law as it existed prior to passage of chapter 53, Laws of 1982, 1st Ex. Sess. Legislative Report, 48th Legislature (Final, 1983), at 59–61. This bill, however, was vetoed in its entirety by Governor Spellman on May 17, 1983. Legislative Report, at 333–34. Although the Legislature may reconvene in extraordinary session to reconsider any bills vetoed, it did not do so and this veto was not overridden.

## 2. Affirmative–Negative Veto Test

Prior case law limited the Governor's veto power by the so–called "affirmative–negative" test. *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 86, 109 P. 316 (1910).

> [T]he Governor may use the veto power to prevent some act or part of an act of the legislature from becoming law. Likewise, the Governor may not use the veto power to reach a new or different result from what the legislature intended. In other words, the veto power must be exercised in a destructive and not a creative manner.

(Citation omitted.) *Washington Ass'n of Apartment Ass'ns,* 88 Wn.2d at 565–66. In *Washington Ass'n,* the Governor's veto of two full sections and parts of nine other sections of the Residential Landlord–Tenant Act of 1973 (RCW 59.18) was found to have substantially altered the act to be more favorable to tenants. We held all of these vetoes to be affirmative and therefore invalid.

The record of this court of employing the affirmative–negative test has been less than clear. *See Fain v. Chapman, supra* (section veto of law providing five new judicial positions in King County to be filled by election upheld); *Hallin v. Trent, supra* (veto of law providing for new superior court positions in three counties to be filled by election upheld because the veto was used destructively without affecting the basic thrust of the legislation); *State ex rel. Ruoff v. Rosellini, supra* (item veto of amount of Governor's salary held valid); *Cascade Tel. Co. v. State Tax Comm'n, supra* (veto of legislative command requiring

public utilities to pass tax on to their customers upheld as negative).

Although we find the veto in this case not to have been an affirmative veto, we believe the affirmative–negative veto concept has outlived its usefulness. Its use by the judiciary is an intrusion into the legislative branch, contrary to the separation of powers doctrine, *State ex rel. Gunning v. Odell,* 58 Wn.2d 275, 278, 362 P.2d 254 (1961), *modified,* 60 Wn.2d 895, 371 P.2d 632 (1962); *Household Fin. Corp. v. State,* 40 Wn.2d 451, 455, 244 P.2d 260 (1952), and substitutes judicial judgment for the judgment of the legislative branch. *See State Pub. Employees' Bd. v. Cook,* 88 Wn.2d 200, 206, 559 P.2d 991 (1977). For an excellent discussion of the separation of powers doctrine with respect to this issue *see State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 264 N.W.2d 539 (1978).

Moreover, we find the test to be unworkable and subjective; it is a conclusion, not a test. There are no standards to predict whether a veto will be perceived by the court as affirmative or negative. Compelling arguments against the affirmative–negative test were made in a recent Wisconsin case:

> To hold that the exercise of the partial veto power may not have an "affirmative," "positive" or "creative" effect on legislation, or that the veto may not change the "meaning" or "policy" of a bill, as some courts elsewhere have done, would be to involve this court in dis[i]ngenuous semantic games. While these tests may be appealing in the abstract, they are unworkable in practice. Every veto may be perceived in affirmative or negative terms, and as either conforming to or defying the general legislative intent, depending upon the observer's perspective. These tests are inescapably subjective. Without an objective point of reference, this court would be reduced to deciding cases upon its subjective assessment of the respective policies espoused by the legislature and the executive, an unseemly result which would foster uncertainty in the legislative process. More importantly, such a result would defeat its own purpose; the judicial department may no more assume the proper

functions of the legislature, or interfere with their discharge, than may the governor.

*State ex rel. Kleczka v. Conta, supra* at 721 (Hansen, J., concurring in part, dissenting in part).

As the defendants note, the test perhaps was needed prior to adoption of amendment 62 when the item veto was not limited to appropriations and the Legislature did not have the authority to call itself back into session to reconsider vetoes. With the changes adopted in amendment 62, its use is no longer appropriate.

The veto of the Governor is upheld. We hereby abandon the affirmative–negative veto test. The Governor is free to veto "one or more sections or appropriation items", without judicial review. The "check", as it has always been, will be the Legislature's two–thirds override. While it may be argued it is difficult for the Legislature to obtain the two–thirds concurrence to call itself into a special veto session or override a veto, these constitutional arrangements are for the people to determine, not this court. If these arrangements become unsatisfactory or subjected to abuse, the people are capable of making desired changes. *See* Const. art. 3, § 12 (amend. 62).

We affirm the decision of the trial court upholding the validity of Laws of 1982, 1st Ex. Sess., ch. 53, p. 1491 and reverse its judgment as to the validity of the veto.

UTTER, BRACHTENBACH, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

ROSELLINI, J. (dissenting)—The majority characterizes seniority rights and benefits as tenure, and then concludes that they are not protected from subsequent modification by the contract clause, Const. art. 1, § 23. Because I disagree with this conclusion as well as the majority's decision to abandon several decades of law regarding the Governor's power to selectively veto legislative enactments, I dissent.

I

The contract clause states that no law impairing the

obligations of contract shall ever be passed. Const. art. 1, § 23. A court faced with a challenge to a legislative enactment under this clause must address two questions. First, does the legislation impair a benefit of state employment? Second, is that benefit a contract right or is it a condition of employment freely modified by the legislation? In the present case, the first question is answered quite readily. As we have said in the past, "A contract is impaired by a statute which alters its terms, imposes new conditions or lessens its value . . ." *Ketcham v. King Cy. Med. Serv. Corp.*, 81 Wn.2d 565, 576, 502 P.2d 1197 (1972). No one can doubt that the terms of the new legislation governing state personnel devalues the benefit of holding state employment. Seniority rights, in particular, represent significant benefits in harsh economic climates such as those last few years. And, as also demonstrated by recent history, the State is peculiarly susceptible to severe cuts in employment budgets in such climates. Under the previous law, the risk of losing one's job was ameliorated by the right to return to that job as soon as funding returned for the position. The new legislation, on the other hand, substantially dilutes that right by making laid–off workers compete for their former positions, positions which they lost, by the way, through no fault of their own.

Consequently, state employees now face not only the uncertainty of unstable funding but also the uncertainty of reemployment when funding returns. This change significantly dilutes the value of seniority to state employees.

Having concluded that this legislation does dilute a benefit of state employment, the only remaining issue is whether that benefit is a contract right.

The majority approaches this issue by first classifying the benefit (as either a pension right or a tenure question) and then limiting the contract clause protection of state workers to pension benefits. This conclusory analysis ignores the underlying controversy. Was there a contractual obligation on the part of the State which could not be modified?

To answer that question, one must understand some

basic contract principles. The term "obligation of contract" means that the law binds parties to perform their undertaking. *Ketcham,* at 570. A contract is formed when parties exchange promises to act or refrain from acting in a certain manner. *See generally* Restatement (Second) of Contracts § 1 (1981). Generally, a promise is a manifestation of the promisor's intent to act in a certain way so made as to justify the person receiving the promise in understanding that a commitment has been made. Restatement (Second) of Contracts § 2 (1981).

Here, appellants argue persuasively that the statutory scheme governing state employment was a promise which they were justified in relying upon. In return for the State's promise, the appellants note that the employees provide continuing consideration by remaining in State service and forbearing more lucrative opportunities in the private sector. Furthermore, this consideration benefits the State significantly. By inducing employees to remain in state employment, the State assures itself of a highly qualified, experienced pool of workers to fill its vacancies.

Finally, this court has recognized the proposition that state employment statutes create statutory contracts. *See Horowitz v. Department of Retirement Sys.,* 96 Wn.2d 468, 472, 635 P.2d 1078 (1981).

The majority ignores these basic contract principles and seeks to limit the statutory contract analysis to pension cases. The majority's arbitrary distinction between pension benefits and other employment benefits vitiates the contract clause protections granted state employees under our previous law. With this result, I cannot agree.

Appellants also offered an alternative theory to establish a contract right to these benefits. That theory, ignored by and large by the majority, is based on the concept of promissory estoppel.

Restatement (Second) of Contracts § 90(1) (1981) defines promissory estoppel:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the

promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*See also Klinke v. Famous Recipe Fried Chicken, Inc.,* 94 Wn.2d 255, 616 P.2d 644 (1980). Appellants urge that under this doctrine the employees' expectations in the benefits granted by the previous statutes should be enforced because they are reasonable and induced action (remaining in state employment) from the state employees. I agree.

The purpose of these statutory provisions was to induce continued state employment. Consequently, equitable contract principles, embodied in the Restatement, section 90, require that we give full effect to the expectations of state employees.

## II

I also disagree with the majority's decision to abandon the distinction between affirmative and negative vetoes. We reaffirmed and explained this distinction in *Washington Ass'n of Apartment Ass'ns, Inc. v. Evans,* 88 Wn.2d 563, 565–66, 564 P.2d 788 (1977). There, we noted:

> [T]he veto power may be exercised only in a negative way, and not in an affirmative way. That is to say, the Governor may use the veto power to prevent some act or part of an act of the legislature from becoming law. Likewise, the Governor may not use the veto power to reach a new or different result from what the legislature intended. *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 109 P. 316 (1910). In other words, the veto power must be exercised in a destructive and not a creative manner.

The majority abandons this distinction on the theory that it has outlived its usefulness. I disagree. Although it may be said that a governor acts as a legislature when exercising veto power, there are clear limits to that power. Two of the checks previously recognized on this power were the affirmative–negative veto distinction and the item veto prohibition. *See Apartment Ass'ns,* at 565. By abandoning the first of these limitations, the majority skews the balance

of power between the Executive and the Legislature. An affirmative veto allows the State's chief executive to fashion legislation with only one–third of the votes of the Legislature. The Legislature, on the other hand, must enact legislation by majority vote. Thus, under the scheme approved today, the Governor becomes both chief executive and a *super legislator.* This result cannot be tolerated under our constitutional scheme.

The majority's decision to abandon this distinction stems in large part from the fact that the Governor's veto here was clearly affirmative in nature. Although the majority asserts that this is not the case, it offers no reasons to support its view. Moreover, as the trial judge found, this veto modified, extensively, this legislation.

Section 30 of the bill, the part vetoed by Governor Spellman, required that the directors of the Department of Personnel and the Higher Education Personnel Board submit proposed regulations for implementing the performance evaluation process to the Legislature for its approval. That the Legislature viewed this provision as essential to the bill cannot be doubted, for the bill specifically provided that the rules and regulations could not become effective until after approval (in the form of a concurrent resolution) by the Legislature. If the Legislature failed to adopt the resolution, sections 6 through 9, 11 through 13, 18, 20 through 22, 25 through 29 would be null and void. Substitute House Bill 1226, § 30, 47th Legislature (1982). By vetoing section 30, the Governor altered the legislative scheme from one in which the Legislature reserved to itself the final decision to implement the act, to one in which the executive branch suddenly had that power. Vetoes of this nature remove limitations on the effectiveness of the legislation and are invalid under the rule enumerated in *Apartment Ass'ns.* As Judge Alexander explained:

> [T]he Governor's veto clearly affects the character of this legislation. It eliminates a condition that the legislature erected as a precedent to the effectiveness of portions of this act. In other words, it has the effect of making a

portion of the statute extant which might otherwise never have become law. This removal of a limitation on the effectiveness of the act broadens it considerably and under the authority and reasoning set forth in the *Apartment Ass'n Inc.*, case, *supra*, renders the veto void as an affirmative veto.

Memorandum Opinion, Clerk's Papers, at 177.

CONCLUSION

Because this veto shifted the power of final approval of the regulations from the Legislature to the executive branch, I believe it represents a clear example of affirmative vetoes. Our case law has prohibited affirmative vetoes because they violate basic principles inherent in the doctrine of separation of powers.

For this reason, and because I believe important contract rights have been violated, I dissent.

WILLIAMS, C.J., and DORE, J., concur with ROSELLINI, J.