152 P.3d 357 (2007)
CITY OF TACOMA, a Washington municipal corporation, Respondent,
v.
Michael P. PRICE, Appellant.
No. 34340-1-II.
Court of Appeals of Washington, Division 2.
February 6, 2007.
Joan Kristine Mell, Miller Quinlan & Auter, Fircrest, WA, for Appellant.
Cheryl Fandel Carlson, Attorney at Law, Assistant City Attorney, Tacoma, WA, for Respondent.
*358 BRIDGEWATER, P.J.
¶ 1 Michael P. Price appeals from a summary judgment in favor of the city of Tacoma. Under its ordinances, the City provided employees with increased longevity pay and increased vacation accrual beginning in the fifth year of the employee's service, and every fifth year thereafter. Based on the history and its interpretation of the ordinance, the City paid these increases beginning in January of the year in which the employee's fifth year of service would be completed, not on the anniversary date of employment. The City's practice applied to all employees. Because Price began his employment in September, he did not receive four months of increased longevity pay and increased vacation accrual for his fifth year of service, and every fifth year thereafter. He claims that the City did not pay him the correct amount of increased longevity pay and increased vacation accrual. We hold that, based on rules of statutory construction, the City paid him a correct amount of longevity pay and credited him a correct amount of vacation accrual. We affirm.

FACTS
¶ 2 In 2004, Michael Price filed a claim for damages with the City, in which he argued that the City did not pay him the correct amount of longevity pay and did not credit him the correct amount of vacation accrual. He maintained that the City ignored the language of Tacoma Municipal Code (TMC) 1.12.133, related to longevity pay, and the language of TMC 1.12.220, related to vacation accrual.
¶ 3 In response, the City sought a declaratory judgment, asking the trial court to approve their interpretation and administration of TMC 1.12.133 and TMC 1.12.220.
¶ 4 After discovery, both Price and the City filed motions for summary judgment and responses. The trial court: (1) applied the rules of statutory construction in interpreting the disputed provisions of the TMC; (2) interpreted the language of the disputed provisions of the TMC in favor of the City; and (3) ruled that the disputed provisions of the TMC did not violate Price's constitutional right to equal protection. Thereafter, the trial court denied Price's motion and granted the City's motion. Price filed a motion for reconsideration, but the trial court denied that motion as well. Ultimately, Price appealed.

ANALYSIS

I. STANDARD OF REVIEW
¶ 5 On review of an order for summary judgment, we perform the same inquiry as the trial court. Hisle v. Todd Pac. Shipyards Corp., 151 Wash.2d 853, 860, 93 P.3d 108 (2004). Thus, the standard of review is de novo. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Summary judgment is granted only if reasonable persons could reach but one conclusion from all the evidence. Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wash.2d 16, 26, 109 P.3d 805 (2005).

II. TERMS AND CONDITIONS OF CIVIL SERVICE EMPLOYMENT
¶ 6 As an initial matter, Price alleges that the trial court erred when it "chose to apply the deference standard applicable to statutory interpretation, rather than contract interpretations." Br. of Appellant at 4-5. He urges us to find that he and the City contracted for his employment. And he urges us to apply the rules of contract construction in interpreting the disputed provisions of the TMC. We disagree with Price.
¶ 7 Washington courts have consistently held that the terms and conditions of public employment do not give rise to contractual rights of any form.[1]Wash. Fed'n of State Employees v. State, 101 Wash.2d 536, 541-42, 682 P.2d 869 (1984); Weber v. Dep't of Corr., 78 Wash.App. 607, 610, 898 P.2d 345 *359 (1995); Greig v. Metzler, 33 Wash.App. 223, 230, 653 P.2d 1346 (1982). Civil service employment is controlled by the civil service statutes, subject to article I, section 23 of the Washington Constitution. State Employees, 101 Wash.2d at 542, 682 P.2d 869; Riccobono v. Pierce County, 92 Wash.App. 254, 263, 966 P.2d 327 (1998). In other words, "civil service employment is grounded on a contract of employment formed between the public employer and the employee, but that the contract incorporates, as implied and controlling terms, the civil service statutes as now existing or hereafter amended, subject to Washington Constitution article I, section 23." Riccobono, 92 Wash.App. at 263-64 n. 25, 966 P.2d 327.
¶ 8 Therefore, the trial court did not err. In construing municipal ordinances, courts are guided by the same rules and principles governing the construction of statutes. City of Spokane v. Vaux, 83 Wash.2d 126, 128-29, 516 P.2d 209 (1973).

III. INTERPRETATION OF THE TACOMA MUNICIPAL CODE PROVISIONS
¶ 9 Price argues that the trial court erred in construing the disputed provisions of the TMC. He claims that "the current interpretation creates ambiguity where there is none." Br. of Appellant at 15. We disagree with Price's position.
¶ 10 The construction of a municipal ordinance is a question of law, which we review de novo. See City of Pasco v. Pub. Employment Relations Comm'n, 119 Wash.2d 504, 507, 833 P.2d 381 (1992). The cardinal rule in construing a municipal ordinance is to ascertain and give effect to the intent of the law-making body, here the City of Tacoma. See Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wash.2d 40, 53, 905 P.2d 338 (1995). When faced with an unambiguous municipal ordinance, we derive the intent of the law-making body from the plain language alone. Waste Mgmt. of Seattle, Inc. v. Util. & Transp. Comm'n, 123 Wash.2d 621, 629, 869 P.2d 1034 (1994).
¶ 11 At issue here is former TMC 1.12.133 (1997),[2] which in part stated:
C. Other City Personnel. Regular, probationary and appointive employees who through union agreement have elected the option of longevity pay or unrepresented employees who have been authorized to receive longevity pay by City Council action, shall receive additional compensation based on a percentage of their base rate of pay received for the class in which they are currently being paid. No application of rate may be used, in computing longevity pay.

Eligible employees shall receive longevity pay in accordance with the following schedule:

 From 5 through 9 years aggregate
 service[[3]] ........................... 1% per month
 From 10 through 14 years aggregate
 service ............................... 2% per month
 From 15 through 19 years aggregate
 service ............................... 3% per month
 20 years or more aggregate service .... 4% per month

Eligibility for longevity pay shall be determined by the length of aggregate City service and will be paid an employee at the first of the calendar year in which any of the above stipulated periods of aggregate service will be completed.
CP at 13.

A. THE CITY'S INTERPRETATION
¶ 12 Under its interpretation of this municipal ordinance, the City provides an *360 employee longevity pay on the first day of the calendar year in which he would complete the stipulated years of aggregate service.
¶ 13 We consider a hypothetical example using Price, who the City hired in September 1974.[4] He completes his first year of aggregate service in August 1975. He completes his second year of aggregate service in August 1976. He completes his third year of aggregate service in August 1977. He completes his fourth year of aggregate service in August 1978. As of September 1978, he starts his fifth year of aggregate service. He works up to the beginning of January 1979. He would complete his fifth year of aggregate service in August 1979.
¶ 14 As of January 1979, he completes only four years and four months of aggregate service. But he would complete five years of aggregate service in August 1979.[5] Thus, because he would complete five years of aggregate service in 1979, the City will pay him one percent additional compensation per month starting on January 1, 1979, until the first day of the calendar year in which he would complete 10 years of aggregate service. Nevertheless, he will not receive any additional compensation for those 1978 months of September, October, November, and December. Therefore, under its interpretation of this municipal ordinance, the City almost never pays an employee additional compensation for an entire year of his aggregate service.

B. PRICE'S INTERPRETATIONS
¶ 15 Yet Price claims that the City's interpretation of this municipal ordinance unjustly denies employees their right to longevity pay. As he notes, "[A]ll employees would lose legitimate benefits." CP at 11. Under Price's interpretation of this municipal ordinance, the City should provide an employee longevity pay on the first day of the calendar year in which he would complete any stipulated period of aggregate service.
¶ 16 According to Price, nothing under TMC 1.12.075 and former TMC 1.12.133 requires the City to calculate the stipulated periods of aggregate service in years. And as he notes, the schedule in former TMC 1.12.133 implies that the length of aggregate service required for additional compensation per month could be anywhere from the beginning day of his fifth year of aggregate service to the final day of his ninth year of aggregate service, and so on. "The language does not require completion of year five, six, seven, eight or nine to trigger payment." Reply Br. of Appellant at 3.
¶ 17 With this understanding in mind, we consider an alternative interpretation suggested by Price, who was hired by the City in September 1974.[6] In this hypothetical example, he completes his first year of aggregate service in August 1975. He completes his second year of aggregate service in August 1976. He completes his third year of aggregate service in August 1977. He works up to the beginning of January 1978. As of September 1978, he would start his fifth year of aggregate service. He would complete four months of his fifth year of aggregate service in December 1978. He would complete the remaining eight months of his fifth year of aggregate service in August 1979.
¶ 18 As of January 1978, he completes only three years and four months of aggregate service. But he would complete four years *361 of aggregate service in August 1978.[7] And he would complete four months of his fifth year of aggregate service in December 1978. Thus, because he would complete four months of his fifth year of aggregate service in 1978, Price argues that the City should somehow[8] pay him one percent additional compensation for the 1978 months of September, October, November, and December, starting on January 1, 1978.
¶ 19 Then, Price works up to the beginning of January 1979. Now, as of January 1979, he completes four years of aggregate service and four months of his fifth year of aggregate service. He would complete the remaining eight months of his fifth year of aggregate service in August 1979. Thus, because he would complete five years of aggregate service in 1979, Price also argues that the City should pay him one percent additional compensation per month starting on January 1, 1979.[9]
¶ 20 In a second alternative interpretation, Price argues that a "reasonable compromise is to simply continue to pay the benefits in January by pay period, but make sure the amount paid includes the increase for the months completed in the previous calendar year." Reply Br. of Appellant at 8. In other words, in a hypothetical example, Price argues that the City should pay him a "lump sum" of one percent additional compensation for the 1978 months of September, October, November, and December, on January 1, 1979, and then should pay him one percent additional compensation per month starting on January 1, 1979.[10]
¶ 21 In a final alternative interpretation, Price argues that the City could pay "the entire accrual for the fifth year at the beginning of the year rather than spreading the increase over the calendar year. Nothing in the ordinance mandates a per pay check payment." Reply Br. of Appellant at 8. In other words, in a hypothetical example, Price argues that the City should pay him a "lump sum" of one percent additional compensation for the 1978 months of September, October, November, and December, and the 1979 months of January, February, March, April, May, June, July, and August, on January 1, 1979.
¶ 22 Therefore, under any of Price's alternative interpretations of this municipal ordinance, the City would pay an employee additional compensation for an entire year of his aggregate service. While some employees would receive more "`early benefits'" than other employees, "no one would be denied their minimum legitimate benefits." CP at 11.

C. THE CITY'S KNOWLEDGE OF DIFFERENT INTERPRETATIONS
¶ 23 Moreover, the City knew that former TMC 1.12.133 could be reasonably interpreted in more than one way. Periodically, employees would question how the City was issuing longevity pay and vacation. In response to Price's questions, the former Human Resources Director for the City wrote in an e-mail, "I have had two or three conversations with Legal and our 25-30 year practice on this might not be right. I have asked legal to research original ordinance which created this practice." CP at 8.
¶ 24 And in response to Price's action, the City subsequently amended former TMC 1.12.133[11] on December 7, 2004, and again on February 15, 2005, "to provide clarification *362 on how the section has historically been administered." CP at 99.

D. OUR INTERPRETATION
¶ 25 Because of our analysis of the above interpretations and the City's later clarifications, we have no difficulty in concluding that, as written, former TMC 1.12.133 was ambiguous. And we therefore resort to principles of statutory construction, legislative history, and relevant case law to assist us in interpreting former TMC 1.12.133. Yousoufian v. Office of King County Executive, 152 Wash.2d 421, 434, 98 P.3d 463 (2004).
¶ 26 In doing so, we must give effect to the legislative intent as determined within the context of the entire municipal ordinance. Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996). We interpret and construe the municipal ordinance so that all the language used is given effect, with no portion rendered meaningless or superfluous. Whatcom County, 128 Wash.2d at 546, 909 P.2d 1303. We ensure that the purpose of an enactment prevails over express but inept wording. Whatcom County, 128 Wash.2d at 546, 909 P.2d 1303. And finally, we avoid a literal reading if it would result in unlikely, absurd, or strained consequences. Whatcom County, 128 Wash.2d at 546, 909 P.2d 1303.
¶ 27 There can be no question that one purpose of former TMC 1.12.133 was to award or recognize employees for their continued service to the City. In addition, we conclude that the City intended to implement former TMC 1.12.133 in a reasonable and efficient manner. After all, the City Manager testified:
I can't remember when we went to longevity pay. It could have been back in the '60s for some part of our workforce, if I am recalling correctly. And I don't know how sophisticated our system would have been at that point in terms of ourthe automated system we had in place.
So I am not sure if I understand the limitations of the systems we had in place at that point . . . [but] I think the intent  not that the language captured it absolutely  certainly, was to facilitate the ease and the certainty of application.
And so if you have these numerous pieces of a year and you have to track all that, it would just be an administrative nightmare. And I think the drafters of the provision at that time and how it was implemented was to have a clean day, January 1st, to start people so you don't have September 4th, and October 15th, and that, it that's what I understand.
So the part of discussion in trying to understand the past practices for those who are put in the position to try to think it through, that certainly would be an ease of application, that if your date is some part of that year, once you finish that year, then January 1st you actually start receiving it and it was easy to track and administer.
CP at 582. And the former City Risk Manager, recalling former TMC 1.12.133, stated:
I think it preceded the computerized payroll system and was done for the convenience of the Payroll Department. So, everybody hired in the same year at one time, if they had to change their vacation or longevity pay they did everybody one time a year rather than tracking 3,500 employees' anniversary dates.
CP at 627.
¶ 28 But if we were to interpret and construe former TMC 1.12.133 consistent with any of Price's interpretations, we would not be giving effect to the City's intent in enacting this municipal ordinance. Moreover, if we were to accept any of Price's interpretations, it would result in absurd consequences. First, we consider the hypothetical example in which the City would pay Price one percent additional compensation for the 1978 months of September, October, November, and December, on January 1, 1978, and the City would pay Price one percent additional compensation per month starting on January 1, 1979. Even though he has yet to complete his fourth year of aggregate service or even to begin his fifth year of aggregate service, Price would be entitled to the one percent additional compensation for the four months of his fifth year of aggregate service on *363 January 1, 1978.[12]
¶ 29 Obviously, under this interpretation, the City would be paying additional compensation to an employee who has yet to even work up to the beginning of his fifth year of aggregate service. And, to prevent unjust enrichment by employees who would leave the City before the beginning of their fifth year of aggregate service, the City would need to adopt a program or method for reimbursement of the longevity pay from these employees. To use the words of the City Manager, "it would just be an administrative nightmare." CP at 582.
¶ 30 Second, we consider the hypothetical example where the City would pay Price a "lump sum" of one percent additional compensation for the 1978 months of September, October, November, and December, on January 1, 1979, and then pay him one percent additional compensation per month starting on January 1, 1979. While this interpretation is certainly reasonable, it would frustrate the City's intent to implement former TMC 1.12.133 in a reasonable and efficient manner. No longer would the City be able to prospectively pay additional compensation from a single "clean day." CP at 582. Instead, the City would need to retrospectively and prospectively pay additional compensation. And under this interpretation, the City would need to maintain more extensive records and to alter how it pays employees.[13]
¶ 31 While Price may question the wisdom and fairness of former TMC 1.12.133, the City's interpretation clearly gives effect to its purpose. After all, under the City's interpretation, it: (1) pays additional compensation to employees only after they become eligible for longevity pay; (2) administers the program only once at the beginning of the calendar year; and (3) does not have to seek reimbursement from employees. Finally, the City's interpretation gives effect to the express, albeit arguably inept, language of the municipal ordinance.[14]
¶ 32 Therefore, we hold that the City's interpretation of former TMC 1.12.133 is the only reasonable interpretation. Thus, the trial court did not err.

III. FOURTEENTH AMENDMENT
¶ 33 In a brief argument, Price contends that the trial court erred in ruling that former TMC 1.12.133 did not violate his constitutional right to equal protection.[15] We disagree.
¶ 34 To begin with, parties raising constitutional issues must present considered arguments to this court. State v. Johnson, 119 Wash.2d 167, 171, 829 P.2d 1082 (1992). "[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion." Johnson, 119 Wash.2d at 171, 829 P.2d 1082 (citations and quotations omitted). Here, without adequate argument, Price summarily concludes that the City has denied his equal protection right. Because of his inadequate argument, we do not review this issue. RAP 10.3(a)(5); Johnson, 119 Wash.2d at 171, 829 P.2d 1082.
¶ 35 Affirmed.
We concur: ARMSTRONG and PENOYAR, JJ.
NOTES
[1] While the State does enter into written employment contracts with unions and individuals on specific occasions, here is not such an instance.
[2] In his brief, Price discusses only former TMC 1.12.133, noting that "the analysis is the same" for former TMC 1.12.220 and that "it is unnecessary to duplicate it here." Br. of Appellant at 5. For clarity's sake, we apply the same analysis and do not separately address vacation longevity accrual. In any case, the relevant language at issue in former TMC 1.12.220 states, "Vacation accruals based on tenure shall be credited at the first of the calendar year in which any of the above periods of aggregate City service will be completed." CP at 14.
[3] Under TMC 1.12.075:

Aggregate service for all purposes shall be the total of all employment, inclusive of authorized leaves of absence, in the City service as a probationary, regular, project, or appointive employee; provided, that: (1) time lost due to suspension of more than 15 working days or layoff shall not be included in the determination of aggregate service; (2) no person employed as a temporary employee shall accrue aggregate service as defined herein; (3) if an employee retires from the City and is rehired in a position under a pension system other than that from which he/she retired, such prior service shall not be credited towards aggregate service.
[4] This example assumes that the City hired him on September 1, 1974, and that he never took a leave of absence.
[5] While the municipal ordinance requires that the stipulated periods of aggregate service will be completed before the City pays an employee longevity pay, it appears that the City requires only that the stipulated periods of aggregate service would be completed. Otherwise, if the City waited until the employee completed his fifth year of aggregate service on August 31, 1979, before paying him longevity pay, the City would have to pay the employee a "lump sum" of longevity pay for the 1979 months of January, February, March, April, May, June, July, and August. But clearly this "lump sum" payment would not comply with the municipal ordinance's requirement that longevity pay "will be paid an employee at the first of the calendar year in which any of the . . . periods of aggregate service will be completed." Former TMC 1.12.133. And there is no evidence that the City ever paid any longevity pay in a "lump sum."
[6] Again, this example assumes that he was hired by the City on September 1, 1974, and that he never took a leave of absence.
[7] Again, while the municipal ordinance requires that the stipulated periods of aggregate service will be completed, it appears that Price, like the City, would require only that the stipulated periods of aggregate service would be completed.
[8] Price does not indicate whether the City should pay this additional compensation in a "lump sum" on January 1, 1978, or whether the City should pay this additional compensation per month starting on January 1, 1978.
[9] And the City would pay Price one percent additional compensation per month until January 1 of the year in which Price would begin his 10th year of aggregate service.
[10] Again, the City would pay Price one percent additional compensation per month until January 1 of the year in which Price would begin his 10th year of aggregate service.
[11] The City also amended former TMC 1.12.220 on December 7, 2004, and again on February 15, 2005, "to provide clarifying language on how the section has historically been administered." CP at 99.
[12] Also we consider the hypothetical example where the City would pay Price a "lump sum" of one percent additional compensation for the 1978 months of September, October, November, and December, and the 1979 months of January, February, March, April, May, June, July, and August, on January 1, 1979. The result is quite similar.
[13] Currently, based on a calendar year budget, the City pays employees on a biweekly basis.
[14] While former TMC 1.12.133 requires that the stipulated periods of aggregate service will be completed, this requirement leads to a strained and absurd consequence. Thus, by agreeing with the City that this phrase should be read as would be completed, we will ensure that the purpose of the municipal ordinance prevails over its express but inept language.
[15] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 12; State v. Coria, 120 Wash.2d 156, 169, 839 P.2d 890 (1992).