[No. 35428.   Department Two.   May 18, 1961.]

JOHN H. LEE *et al., Respondents,* v. PETER BARNES *et al., Appellants.**

*Reported in 362 P. (2d) 237.

*Colvin & Williams* (*John J. Keough*, of counsel), for appellants.

*Washington & Wickwire*, for respondents.

FINLEY, C. J.—John Lee owned several motion picture theatres in central Washington and the equipment necessary to operate them. Peter Barnes desired to buy Lee's holdings. The following transaction was entered into. Barnes organized six corporations, each of which was to operate one or more theatres in a given geographical area. The interest of each corporation was so tightly interwoven with the performance of the others under the twenty-one documents the parties executed (*e.g.*, a default by one was a default by all) that for our present purposes we can consider them as a unit.

The theatres themselves were leased by Lee to the corporations for ten years, with an option in the corporations to renew for an additional ten years. The rental was based on stated percentages of the income with a guaranteed minimum. Lee sold to the corporations the theatre equip-

ment (including fixtures which the parties treated as personal property) and the business. Each corporation received a bill of sale listing the equipment that had been sold. The prices stated for the equipment were inflated so that the total sale price of $370,000 equaled the value of the equipment plus the value of the business. The corporations made a downpayment of $90,000. To secure payment of the balance of the purchase price and to insure faithful performance under the leases, promissory notes and documents described as chattel mortgages were executed by the corporations. Barnes is a party to this action because he guaranteed all aspects of the corporations' performance. Barnes' liability, however, was expressly limited to a maximum of $280,000 (the original indebtedness evidenced by the notes) or such lesser sum to which the principal should be reduced.

The theatre operation proved to be unprofitable. The corporations, after a time, failed to make the required installment payments on the notes and also failed to pay the rental reserved under the lease. Lee sent notice of default to Barnes and the corporations and brought this action to foreclose the chattel mortgages and to have a receiver appointed to operate the theatres during the pendency of the action. The trial court granted the relief requested. Barnes and the corporations appeal.

In a preliminary skirmish, Barnes, who is not a resident of this state, contested the jurisdiction of the court as to him. In a master contract covering the entire transaction, Barnes appointed H. A. Davis as his agent to receive personal service of process. Barnes does not suggest that Davis was improperly served, but argues that at the time the contract was executed, in 1956, one could not appoint another person for such a purpose.

Barnes' argument is that RCW 4.28.080, the statute governing service of summons, does not expressly authorize service upon a resident agent of a non-resident defendant. To this point we are in agreement with him. He argues further that such service was authorized by Laws of 1959, chapter 131, p. 669, and that prior to 1959, therefore, it

would necessarily have been unauthorized and invalid. Here we part company. Laws of 1959, chapter 131 (RCW 4.28.180-.185), deals with personal service outside the state upon the defendant himself. Its enactment does not affect the matter of a non-resident's contracting as to a special mode of service.

In addition, Barnes argues that enforcement of the substituted service agreement would open the door to unlimited opportunities for the practice of fraud.

*Gilbert v. Burnstine* (1931), 255 N. Y. 348, 174 N. E. 706, 73 A. L. R. 1453, involved the following facts. The defendant had contracted that certain disputes would be settled by arbitration in London. When a dispute arose, the defendant refused to submit the matter to the designated form of arbitration. The English court issued process (which was served on the defendant in New York) and appointed an arbitrator who decided the dispute against the defendant. The New York lawsuit arose when the plaintiff attempted to collect on the arbitration award. The defendant contested the jurisdiction of the English court to order arbitration. The New York court concluded to the contrary as follows:

". . . Contracts made by mature men who are not wards of the court should, in the absence of potent objection, be enforced. Pretexts to evade them should not be sought. Few arguments can exist based on reason or justice or common morality which can be invoked for the interference with the compulsory performance of agreements which have been freely made. Courts should endeavor to keep the law at a grade at least as high as the standards of ordinary ethics. Unless individuals run foul of constitutions, statutes, decisions or the rules of public morality, why should they not be allowed to contract as they please? Our government is not so paternalistic as to prevent them. Unless their stipulations have a tendency to entangle national or state affairs, their contracts in advance to submit to the process of foreign tribunals partake of their strictly private business. Our courts are not interested except to the extent of preserving the right to prevent repudiation. In many instances problems not dissimilar from the one presented by this case have been solved. Vigor has been infused into process otherwise impotent. Consent is the factor which imparts power. Text writers have discussed

the subject and have concluded from the authorities that non-resident parties may in advance agree to submit to foreign jurisdiction. (Beale, The Jurisdiction of Courts over Foreigners, 26 Harvard Law Review, 193; Freeman on Judgments [5th ed.], vol. 3, p. 3053; Goodrich Conflict of Law, p. 141; Scott, Fundamentals of Procedure, pp. 39-41.) . . .

"Public policy, therefore, would not forbid defendants to appoint an agent to accept service or to confess judgment in their behalf, nor does it after service forbid them in person to acknowledge receipt of it. If the fact be clear that in advance of any form of litigation or arbitration they actually intended to contract that in the event of such a proceeding they would render themselves subject to foreign process, the same policy ought to prevail. . . ."

We agree with the reasoning and the resolution of the matter by the New York court. Service on H. A. Davis, in conformity with the contract of the parties, was effective to give the court personal jurisdiction over Barnes. See, also, *Union City v. Capitol-Theatre Amusement Co.* (1948), 26 N. J. Misc. 102, 57 A. (2d) 226; *Purcell v. Bennett* (1902), 68 N. J. L. 519, 53 Atl. 235.

■ Finally, on the issue of service, Barnes suggests that inasmuch as Federal Rules of Civil Procedure, Rule 4 (d) (1), 28 U.S.C.A., authorizes service upon an individual "by delivering a copy of the summons and of the complaint to an agent authorized by appointment," the contract should be interpreted to mean that actions could be brought only in federal courts. We think it is clear that this contention is invalid because the contract simply does not say what Barnes now would have it say.

■ Barnes' next assignment of error relates to the following statement made by the trial judge in ruling on the motion to quash service of process:

"The defendant Peter Barnes in argument in the memorandum provided to the Court in support of the motion to quash the service of the summons, has argued that service of the summons and complaint as made in this action should not be permitted because it would open the way to fraud and clandestine practice. However, the facts in the present instance do not support this argument. It appears to the Court that the defendant Peter Barnes is the one trying

to perpetrate a fraud by making a contract and thereafter escape the consequences of it by bringing up the question of the technicalities of service of summons and complaint in the State of Washington. However, the question as to whether or not this is an attempted fraud on the part of Mr. Barnes is not before the Court and is not the basis for the decision of the Court on this motion."

Barnes moved for a mistrial on the ground that the statement manifested preconceived factual conclusions which indicated prejudice and that the trial judge should therefore disqualify himself. Error is assigned to the denial of a mistrial. The statement itself was improvident, to say the least, and the trial judge's subsequent explanation of it is not a model of clarity; but we cannot infer prejudicial error from its having been made.

■ Appellants' primary argument is that the transaction was in fact one of conditional sale rather than sale with a chattel mortgage back. The label affixed to a security interest by the parties does not necessarily determine its legal significance. This, in some instances, may be ascertained only by an examination of the true nature of the transaction. *West American Finance Co. v. Finstad* (1928), 146 Wash. 315, 262 Pac. 636. Appellants' position is that Lee retained such firm control over the personal property that the only reasonable premise is that he retained title.

■ At this point we can dispose of the bulk of appellants' arguments with reference to the leases. Many cases are cited by appellant for the proposition that a purported lease with option in the lessee to buy at a price close to the total specified rent is in fact a conditional sale. But the cases cited are not in point. The leases noted and emphasized by appellant relating to real property provide, among other things, that if the lessor receives an offer to purchase from a third party, which he desires to accept, that the terms of the offer shall be disclosed to the lessees, who then have forty-five days to purchase on the same terms. This, it seems to us, is patently quite a different arrangement from a disguised conditional sale.

Many of the elements of control reserved by the lessor,

which the lessees characterize as being so onerous that they can be explained only if Lee retained title to the theatre equipment and furnishings (we will not describe them all here), are quite clearly designed to protect the lessor's income under the percentage-rental lease. They do not suggest anything more than what that part of the transaction purports to be—a lease.

Key provisions of the purported chattel mortgage are that upon any default by appellants, Lee could

". . . without notice, declare the whole sum of both principal and interest due and payable, and at once proceed to collect the same *and take immediate possession of the property herein mortgaged* and may foreclose this mortgage in any manner provided by law . . ." (Italics ours),

and that

". . . The mortgagor promises to pay any deficiency remaining after the application of the proceeds of any sale of the mortgaged property upon the debt thereby secured."

██ ██ A provision in a mortgage that the mortgagee may take summary possession of the property gives no right to take possession without consent of the mortgagor (*Lessard v. Smith* (1954), 45 Wn. (2d) 473, 275 P. (2d) 730), but neither does such a provision necessarily mean that a purported mortgage is in fact a conditional sale. In *Gervasi v. Seattle & Rainier Valley R. Co.* (1928), 148 Wash. 635, 269 Pac. 1050, we described the transaction there in dispute as follows:

"The purported conditional sale contract, among other things, provided that, in the event of default the vendor could retake the automobile, sell it, charge all costs and attorneys' fees to the purchaser who should be liable for any deficiency. . . . The result is that title passed to Gervasi at the time the contract was made and the automobile delivered to him."

We concluded that the security interest enjoyed by the seller, therefore, had been a chattel mortgage, notwithstanding the fact that the contract had characterized the transaction as a conditional sale. *Roberts v. Speck* (1932), 170 Wash. 324, 16 P. (2d) 463 is in accord.

In *Smith v. Downs* (1956), 48 Wn. (2d) 165, 292 P. (2d) 205, it was said that

".  .  . It is the law of this state that, where the contract provides that, after default and retaking of the property and sale thereof, any deficiency remaining shall be paid as liquidated damages, regardless of any of its other provisions, it creates the relation of debtor and creditor and title passes upon the execution of the contract."

Appellants also have urged that not only the property but the business was sold, that the business is an intangible and therefore not susceptible to being mortgaged, and that the necessary conclusion is that there was a conditional sale. The simplest answer to the argument is that only the tangible property was mortgaged to secure debt.

Discussion of every facet of the transaction which appellants say contribute to an overall effect of a conditional sale would unduly lengthen this opinion. We appreciate the importance of this case to appellants and can understand the industry of their counsel. We have carefully considered all of their arguments and have discussed those we think most effectively contribute to their cause. We conclude that the transaction was what it purports to be: a lease of the real property and a sale of the personal property with a chattel mortgage back to the seller, Lee.

The foregoing disposition does not apply to the concession bar at the Lake Theatre in Moses Lake, which was handled in a somewhat different, and somewhat perplexing, manner. The main floor of the theatre building was leased to appellant Cherokee Amusements, Ltd. The furnishings and equipment except the concession bar were sold to Cherokee. Appellant Okanogan Enterprises, Ltd. acquired various interests in the concession bar. The precise nature of Okanogan's interest is beclouded with ambiguity. Three documents indicate that Lee *sold* the concession bar to Okanogan and took a promissory note and chattel mortgage back. If the installment terms of the note were regularly met, the note would have been paid within less than eight years. However, the fourth document is a ten-year *lease*

by Lee to Okanogan *of the same concession bar,* reserving rental of 7½% of the gross income.

Appellants ask us to hold that the sale of the concession bar was conditional. Characterizing the sale as conditional, with title therefore in the seller, would do nothing to explain either why the buyer should pay a percentage rental as well as the purchase price or why, after the purchase price had been paid the then owner should pay rental to the seller. The latter conflict would also be present if the sale were treated as unconditional with payment of the price secured by a chattel mortgage.

■ The conflict, as it exists, cannot be resolved. Either there was a lease or a sale. The documents were executed contemporaneously. If the lease were considered to have come first, the sale would have terminated it. If the sale came first, there was thereafter nothing to lease. In either event, the lease would have to fall. Without the lease, the transaction bears the indicia of a sale with chattel mortgage back. We conclude, therefore, that there was a sale with payment secured by a chattel mortgage, and that the lease was invalid. The purported rental payments should be applied to the principal amount of the debt.

■ RCW 61.12.060 contains, in part, the following provisions regarding foreclosure of mortgages:

" . . . The court, in ordering the sale, may in its discretion, take judicial notice of economic conditions, and after a proper hearing, fix a minimum or upset price to which the mortgaged premises must be bid or sold before confirmation of the sale.

"The court may, upon application for the confirmation of a sale, if it has not theretofore fixed an upset price, conduct a hearing, establish the value of the property, and, as a condition to confirmation, require that the fair value of the property be credited upon the foreclosure judgment. . . ."

Appellants asked the court to hold a hearing and set an upset price prior to the sale. The motion was denied. The denial, we are convinced, was erroneous.

The property sold at the foreclosure sale (theatre furnishings and equipment) is of a somewhat unique nature.

The number of interested bidders seemingly would be limited. The public sale procedure in this case lends no assurance that a price approaching the fair value of the property would be bid. In fact, respondent Lee purchased all of the property for $63,000—about one-sixth of the price at which he sold substantially the same property plus the going business some four and one-half years earlier.

The cause is remanded to the superior court with instructions to establish the fair value of the property sold, in conformity with RCW 61.12.060, and to modify the appropriate judgments with respect to the payments made under the purported lease of the concession bar at the Lake Theatre of Moses Lake. The parties shall bear their own costs on this appeal.

It is so ordered.

HILL, WEAVER, ROSELLINI and FOSTER, JJ., concur.

August 21, 1961. Petition for rehearing denied.