[No. 51263-3-I. Division One. October 11, 2004.]

DANIEL A. CASEY, *Appellant*, v. JAMES D. CHAPMAN, ET AL., *Respondents*.

*William K. McInerney, Jr.*, for appellant.

*Kevin P. Hanchett* (of *Lasher Holzapfel Sperry & Ebberson*), for respondents.

Cox, C.J. — The primary issue that we decide is the nature of the interest that a successful bidder at a UCC (Uniform Commercial Code) foreclosure sale of a partnership interest acquires at the sale. Governing law generally restricts the rights of an assignee of a partnership interest to profits, not management or voting rights.[1] Here, there is no agreement by all the partners of the partnership that either the original assignee of the partnership interest or the successful bidder at a UCC foreclosure sale that pledged collateral was entitled to anything more than profits. Accordingly, we hold that the successful bidder at the foreclosure sale in this case acquired only the right to receive profits allocable to the partnership interest sold at sale, not voting or management rights. Moreover, we hold that the foreclosure sale was commercially reasonable notwithstanding the court's discretionary decision not to set an upset price as a condition to confirming the sale. We affirm in part and reverse in part.

By partnership agreement dated October 28, 1985, Daniel Casey, James Chapman and others formed a general partnership known as the South 320th Federal Way Partnership. They formed it for the purpose of acquiring, developing, and managing commercial real property.

By early 1993, South 320th had five partners. Their names and percentages of interest in the partnership were

---

[1] Former RCW 25.04.270 (1955), *repealed by* LAWS OF 1998, ch. 103, § 1308, effective Jan. 1, 1999.

then: Casey (40 percent), Chapman (20 percent), Charles Binford (10 percent), Charles Eggener (20 percent), and QCI, Inc. (10 percent).

By a purchase agreement dated February 10, 1993, Casey purchased Chapman's "entire Partnership Interest" for $200,000. All of the then partners signed the purchase agreement and expressly acknowledged that Chapman would withdraw from the partnership as of the closing date specified in the agreement.

As part of the same transaction, Casey made a down payment of $15,000 and delivered a nonrecourse promissory note to Chapman for $185,000, the deferred balance of the $200,000 purchase price. The parties concurrently executed a security agreement in which Casey pledged to Chapman the partnership interest that was the subject of the purchase as collateral for his obligation to pay the note. The security agreement contained an acceleration clause under which the entire unpaid balance would become immediately due and payable if Casey remained in default after 30 days' written notice and further provided for foreclosure and sale of the collateral.

By January 1995, Casey ceased paying the obligation evidenced by the note. Chapman commenced foreclosure proceedings by giving notice of default. Casey commenced this action and obtained a temporary restraining order and preliminary injunction prohibiting the sale from going forward. While this litigation was pending, the parties entered into a settlement agreement. In brief, it required Casey to pay Chapman $400,000 in exchange for additional time to make payments on the original note. If he failed to make the required payment, a foreclosure sale of the collateral under the UCC was to occur on October 15, 1999.

Casey failed to make the required payment, and Chapman conducted the sale on the date scheduled. Bruno Investments, L.L.C. was the successful bidder at the sale, purchasing for $200,000 the partnership interest that Casey pledged as collateral.

After the sale, Chapman moved for entry of a declaratory judgment regarding the effect and validity of the UCC sale. Specifically, he sought a judgment determining that the sale was valid and that the purchaser acquired the partnership interest Casey pledged, including "all voting rights, equity interests and economic interests."

In response, Casey asked the court to set an upset price as a condition to confirming the sale. It appears that he argued the upset price amount should have been $400,000.

The court granted Chapman's motion and denied Casey's.

Casey appeals.

## STANDING

Casey argues that Chapman does not have standing to obtain a declaratory judgment and the court did not have jurisdiction because Bruno Investments was the successful bidder at sale and is not a party to this action. We disagree.

■ "A person interested under a . . . written contract . . . whose rights . . . are affected by a . . . contract" may seek declaratory relief.[2] Parties whose financial interests are affected by the outcome of a declaratory judgment action have standing.[3]

Here, Casey, who defaulted on the note, sued Chapman to obtain an injunction to prevent the foreclosure sale. The parties then entered into a settlement agreement that provided for additional time, additional money, and foreclosure if Casey failed to pay the additional money. Because Chapman's financial interests are affected by the outcome of this declaratory judgment action, he has standing.

Casey's jurisdictional argument is likewise unpersuasive. There is no doubt here that the superior court had subject matter jurisdiction of this declaratory judgment action.

---

[2] RCW 7.24.020.

[3] *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 379, 858 P.2d 245 (1993) (citing *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 493, 585 P.2d 71 (1978)).

Thus, Casey's argument appears to be that the absence of that type of jurisdiction is fatal. Casey is wrong.

■ ■ "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration."[4] But under the circumstances of this case, the absence of Bruno is not fatal.

In *Williams v. Poulsbo Rural Telephone Ass'n*, the Supreme Court stated, " 'If a complete determination can be had without the presence of other parties, then the right to bring them in is addressed to the sound discretion of the court.' "[5] This rule is designed to guarantee that the interests of an absentee party will be adequately protected.[6]

■ Here, Bruno is wholly owned by Chapman and, as such, Bruno's interests are adequately protected by Chapman. A complete determination can be had without naming Bruno as a party since Chapman is named in the lawsuit. The trial court did not abuse its discretion in declining to require joinder of Bruno as a party. Chapman has standing to seek a declaratory judgment. Joinder of Bruno Investments was not necessary.

## THE PARTNERSHIP INTEREST

Casey contends that the trial court erroneously entered its declaratory judgment in favor of Chapman. Specifically, he argues that Bruno Investments, the successful bidder at the foreclosure sale, acquired only the rights to profits, not voting and management rights, at the sale. We agree.

---

[4] RCW 7.24.110.

[5] 87 Wn.2d 636, 644, 555 P.2d 1173 (1976) (quoting *State ex rel. Cont'l Cas. Co. v. Superior Court*, 33 Wn.2d 839, 842, 207 P.2d 707 (1949)), *overruled on other grounds by Chem. Bank v. Wash. Pub. Power Supply Sys.*, 102 Wn.2d 874, 887-88, 691 P.2d 524 (1984), *cert. denied*, 471 U.S. 1075 (1985). *Accord Mayo v. Jones*, 8 Wn. App. 140, 146-47, 505 P.2d 157 (1972); *see In re Bridge's Estate*, 40 Wn.2d 133, 135, 241 P.2d 439 (1952); *Toulouse v. N.Y. Life Ins. Co.*, 39 Wn.2d 439, 440-41, 235 P.2d 1003 (1951).

[6] *See Williams*, 87 Wn.2d at 644.

■ ■ We reverse a superior court's order confirming a sale only for a manifest abuse of discretion.[7] We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[8] When there are no factual disputes and an appellant seeks reversal of the trial court's legal conclusions, we review the trial court's decision on declaratory relief de novo.[9]

*Nature of the Interest Purchased*

Casey argues that the purchaser of the partnership interest at the UCC sale acquired the right to receive a pro rata share of the profits of the partnership, nothing more. Specifically, he claims that the collateral sold at sale did not include voting and management rights in South 320th.

We first note there are no genuine issues of material fact in this case. Rather, we are confronted with issues of law—the nature of the interest that Casey purchased in 1993 and that was sold in the 1999 UCC foreclosure sale. Nothing in the record suggests that the nature of the partnership interest changed between the time it was purchased and later sold at the foreclosure sale.

■ ■ To determine the nature of the partnership interest that Casey purchased from Chapman in the February 10, 1993 transaction, we turn to the Washington partnership statute that was then in effect.[10] Former RCW 25.04.270 states:

---

[7] *Braman v. Kuper*, 51 Wn.2d 676, 681, 321 P.2d 275 (1958); *Williams v. Cont'l Sec. Corp.*, 22 Wn.2d 1, 17, 153 P.2d 847 (1944); *John Davis Estate, Inc. v. Rochelle*, 181 Wash. 81, 83, 42 P.2d 788 (1935).

[8] CR 56(c).

[9] *See To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 410, 27 P.3d 1149 (2001), *cert. denied*, 535 U.S. 931 (2002).

[10] In briefing to this court, the parties have suggested that partnership statutes of the state of Alaska have some bearing on the issues before us. We disagree. The purchase agreement of February 10, 1993 expressly states at paragraph 10:

This Agreement shall be governed by, construed and enforced in accordance with the internal laws of the state of Washington, without giving effect to principles and provisions thereof relating to conflict or choice of laws and

(1) A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, *nor, as against the other partners in the absence of agreement, entitle the assignees,* during the continuance of the partnership, *to interfere in the management or administration of the partnership business or affairs,* or to require any information or account of partnership transactions, or to inspect the partnership books; *but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.*[11]

The plain language of the above statute makes two things clear. First, a partner may assign his or her interest without dissolving the partnership. Second, to the extent that the assignment involves management, administration, and other partnership issues, all partners must agree that such rights follow the assignment.

Here, we look to the purchase agreement and its attached assignment of the partnership interest. Neither document states that all partners agree that management, administration, or voting rights go with the sale of Chapman's partnership interest to Casey. In the absence of a clear statement that management, administration, or voting rights were included in the sale, we must conclude that such rights were not part of the transaction. The statute then in effect required such agreement by the partners. Thus, Chapman sold only the right to participate pro rata in profits when he sold the partnership interest to Casey and withdrew from the partnership in 1993.

*Nature of the Collateral Pledged*

■ It is axiomatic that if Casey purchased only the right to profits, not voting and management rights, in his 1993 transaction with Chapman, Casey could not pledge any

---

irrespective of the fact that any one of the parties is now or may become a resident of a different state.

Thus, we look to Washington partnership law to determine the nature of the interest at issue.

[11] (Emphasis added.)

greater rights to Chapman, who withdrew from the partnership at the closing of the transaction. While the language of the security agreement is broad and the enforcement mechanisms contained therein are elaborate, the simple fact of the matter is that the collateral consisted solely of the right to receive profits, nothing more.

Chapman argues that the phrase "entire partnership interest," as stated in the purchase agreement, shows that the property sold and pledged in 1993 and sold at the UCC foreclosure sale to Bruno in 1999 was the same. We agree. But that begs the question of what the law requires for a partner to transfer more than a right to receive profits of a partnership. The former statute, which we have quoted and discussed in a prior portion of this opinion, shows what is required. And the record before us shows that the parties did not comply with that statute. In short, only the right to receive profits was sold, nothing more.

 Chapman also points to RCW 25.05.005(9) for support that "the partnership interest" is something more than we hold. That statute states: " '[p]artnership interest' or 'partner's interest in the partnership' means all of a partner's interests in the partnership, including the partner's transferable interest *and* all management and other rights."[12]

The chief problem with this argument is that the quoted statute became effective in Washington on January 1, 1999. The transaction before us predated the statute by six years. We see no basis for retroactively applying this statute to a 1993 transaction.

Chapman also claims that if he sold only the right to profits in 1993, this appeal is moot. He claims that he must have retained his management and voting rights even though he sold the former to Casey, which were then pledged as collateral for the note. We do not agree.

 It is difficult to see how a partner who has withdrawn from the partnership as of the sale of his interest

---

[12] (Emphasis added.)

retains management rights or anything else in the partnership. But more importantly, this argument fails to deal with the former statute and fails to show anything in the record to show compliance with it.

Chapman also argues that Casey and all the other partners gave their consent to the successful purchaser at a possible foreclosure sale becoming a partner by consenting to the sale of the partnership interest and the use of that interest as collateral for the note. A careful review of the record shows that this argument is unsupported by the sale and security agreement documentation.[13]

All partners signed the security agreement. The default provisions of the agreement allow the secured party to "proceed against the Partnership Interest." But that does not inform us that the partners agreed that a foreclosing creditor would have voting and management rights. This is especially true since there is no evidence of any agreement by the partners that such rights were sold in the first place.

Chapman next claims that an amendment to the joint venture agreement in which South 320th Federal Way Partnership is one of the venturers allows Bruno to join the partnership. We disagree.

The amendment to the joint venture agreement, fairly read, has nothing to do with either the partnership agreement of South 320th or the sale and security documents which are dispositive in this case. Rather, the purpose of the amendment appears directed to other venturers in the joint venture.

Finally, Chapman argues that the doctrine of equitable estoppel bars Casey from objecting to the substitution of Bruno as a partner. Specifically, Chapman argues that Casey's statement pledging his "partnership interest" as collateral and authorizing foreclosure and sale upon default is inconsistent with his present claim that the buyer at the foreclosure sale cannot acquire a partnership interest that includes the right of management. We disagree.

[13] Clerk's Papers at 190.

"The doctrine of equitable estoppel precludes a party from asserting a claim or position based on equitable principles."[14] The first element of equitable estoppel requires an admission, statement, or act inconsistent with the claim afterwards asserted.[15] "Estoppel is not favored and the party asserting estoppel must prove each element by clear, cogent and convincing evidence."[16]

Here, the first element to support a claim of equitable estoppel is not met. Casey's agreement stated that he conveyed his "entire partnership interest." However, while this statement may have created an ambiguity, the partnership statute in effect in 1993 did not allow a conveyance of a partnership interest to include the right "to interfere in the management or administration of the partnership business or affairs" absent the agreement of the other partners.[17] That Chapman (or Bruno) is now entitled only to pro rata profits from the partnership is not inconsistent with Casey's earlier agreement. For these reasons, Chapman's argument fails.

To summarize, a partnership is a voluntary association of individuals governed by certain statutory requirements. While the assignment of a partner's interest in the partnership is permitted, absent agreement of the other partners, the nature of the interest assigned is limited to the right to profits.[18] Here, there is no evidence of the partners agreeing to allow anything more than the sale of the right to

---

[14] *Kinnebrew v. CM Trucking & Constr., Inc.*, 102 Wn. App. 226, 235, 6 P.3d 1235 (2000).

[15] *See Kinnebrew*, 102 Wn. App. at 235.

[16] *Kinnebrew*, 102 Wn. App. at 235 (citing *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 831, 881 P.2d 986 (1994); *Colonial Imports, Inc. v. Carlton N.W., Inc.*, 121 Wn.2d 726, 734, 853 P.2d 913 (1993)).

[17] *See* former RCW 25.04.270 (1955), *repealed by* LAWS OF 1998, ch. 103, § 1308, effective Jan. 1, 1999.

[18] The other limited statutory rights set forth in former RCW 25.04.270(1) and (2) are not involved in this litigation:

(1) A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignees, during the continuance of the partnership, to interfere in the management or administration of the partnership business or

receive a pro rata share of profits. Thus, all that was sold and later pledged was the right to receive profits, no more. The superior court erred in deciding otherwise.

## UPSET PRICE

Casey finally argues that the court abused its discretion when it declined to establish an "upset price" as a condition to confirming the foreclosure sale. We hold that the court properly exercised its discretion in declining to set an upset price. Moreover, the sale was commercially reasonable, as required by the UCC.

█ █ Typically, an upset price is a minimum price that must be bid for mortgaged real property as a condition for the trial court's confirmation of the sale.[19] "The decision to [establish] an upset price, and the price itself, are matters within the court's sound discretion."[20]

█ Casey argues that *Lee v. Barnes*,[21] where a debtor sought to fix a price for a chattel mortgage on several movie theaters and furnishings, stands for the proposition that it is error for a court to deny a motion to establish an upset price given property of a unique nature. In *Lee*, however, the creditor was entitled to a deficiency judgment. Where a creditor seeks to sell collateral for a low price and also seeks a deficiency, there is a basis to set an upset price as a condition to confirming a sale.

---

affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.

(2) In case of a dissolution of the partnership, the assignee is entitled to receive his assignor's interest and may require an account from the date only of the last account agreed to by all the partners.

*Enacted by* LAWS OF 1955, ch. 15, § 27.

[19] *Am. Fed. Sav. & Loan Ass'n of Tacoma v. McCaffrey*, 107 Wn.2d 181, 728 P.2d 155 (1986); RCW 61.12.060.

[20] *Farm Credit Bank of Spokane v. Tucker*, 62 Wn. App. 196, 204, 813 P.2d 619, *review denied*, 118 Wn.2d 1001 (1991).

[21] 58 Wn.2d 265, 362 P.2d 237 (1961) (applying RCW 61.12.060 to establish an upset price in the foreclosure of a chattel mortgage).

Here, there is no deficiency judgment at issue, Bruno's bid of $200,000 for the partnership interest is equal to the amount of debt owed, and Casey is not responsible for any deficiency. The trial court properly exercised its discretion when it denied the motion to set an upset price.

■ We further note that the proper standard to apply in a UCC foreclosure sale is set forth in article 9 of the UCC. In sales under article 9A, disposition of collateral must be "commercially reasonable."[22] In *McChord Credit Union v. Parrish*,[23] where a creditor foreclosed on an automobile that was collateral in a security agreement, the court concluded that a creditor who has violated the UCC with respect to disposition of collateral faces a rebuttable presumption that the value of collateral is at least equal to the amount of outstanding debt. In order to overcome the presumption, the creditor must either obtain a fair and reasonable appraisal at or near the time of repossession or produce convincing evidence of value of collateral.[24]

Here, the collateral sold for the value of the debt, $200,000. This sales price is presumptively commercially reasonable according to the court's holding in *McChord*. Casey estimated the partnership interest was worth $400,000, but failed to present any evidence of the value of

---

[22] RCW 62A.9A-610. **Disposition of collateral after default.** (a) **Disposition after default.** After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

(b) **Commercially reasonable disposition.** Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

(c) **Purchase by secured party.** A secured party may purchase collateral:

(1) At a public disposition; or

(2) At a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

[23] 61 Wn. App. 8, 809 P.2d 759 (1991).

[24] *McChord*, 61 Wn. App. at 14.

the partnership other than his own unsupported opinion. The trial court was in the best position to weigh the evidence and decide that Casey failed to overcome the presumption of commercial reasonableness. Nothing shows the court's decision was untenable.

We affirm the declaratory judgment in all respects except that we reverse the provision stating Bruno was entitled to all voting rights, equity interests, and economic interest in the partnership in the purchaser.

COLEMAN and KENNEDY, JJ., concur.