[No. 32129. *En Banc.* July 22, 1953.]

H. H. HERROLD et al.,́ *Appellants,* v. OTTO A. CASE, *as Commissioner of Public Lands, et al., Respondents.*[1]

*Lundin & Barto,* for appellants.

*Helsell, Paul & Fetterman,* for respondents.

WEAVER, J.—The trial court sustained a demurrer to plaintiffs' complaint. This is an appeal from a judgment dismissing plaintiffs' action.

The question, determinative of this decision, is whether the plaintiffs have capacity to maintain this action under the facts alleged.

The facts, as we state them, appear in the complaint.

[1]Reported in 259 P. (2d) 830.

In the summer of 1950, the plaintiffs, husband and wife, each applied to defendant Jack Taylor, commissioner of public lands, for a lease on less than forty acres of certain land, lying below extreme low tide in the bed of navigable waters, to be used to plant and cultivate oysters. Since the commencement of this action, Otto A. Case has been substituted as a party respondent in place of Jack Taylor.

Oyster-bed lease No. 143 expired July 21, 1950. It had previously been issued to another party, but, at the date of its expiration, it stood in the name of defendant Bendiksen by assignment. July 25, 1950, plaintiff husband applied to the commissioner of public lands to have this lease issued to him.

August 9, 1950, defendant Bendiksen applied for a renewal of the lease. Rem. Rev. Stat., § 7797-145, provided in part:

". . . Upon the expiration of any lease for the purpose of planting and cultivating artificial oyster beds, . . . the lessee shall have the right to make application to release the lands covered by his former lease within thirty days from the expiration of such former lease." (This section has since been repealed. Laws of 1951, chapter 271, § 47, p. 913.)

Hence, the application for a renewal of the lease of defendant Bendiksen was timely made.

RCW 79.20.050 [cf. Rem. Rev. Stat., § 7797-146] provides that:

"The commissioner may, upon the filing of an application for a renewal lease, cause the lands to be inspected, and *if he deems it for the best interests of the state to re-lease said lands, he shall issue to the applicant a renewal lease . . .*" (Italics ours.)

Thus, the commissioner of public lands had two lease applications before him for the same oyster land: one was for a renewal of the existing lease.

Under RCW 79.20.050 [cf. Rem. Rev. Stat., § 7797-146] (quoted *supra*), the commissioner had the discretionary power to renew the lease of defendant Bendiksen "if he

deems it for the best interests of the state." The lease was issued to Bendiksen.

To circumvent the discretionary power of the commissioner to renew Bendiksen's lease, it is alleged in the complaint that he did not have a preferential right by statute (RCW 79.20.050; Rem. Rev. Stat., § 7797-146) to re-lease the land because, at the time of issuance,

". . . defendant E. H. Bendiksen was the actual owner of other deep sea oyster leases exceeding 40 acres and had no preferential right nor any right to lease or hold the said land in question . . ."

In support of this statement, it was alleged that on August 8, 1950 (the day prior to Bendiksen's application to re-lease), Bendiksen was the record owner of oyster-bed lease No. 107, expiring in 1959, and oyster-bed lease No. 108, expiring in 1956; that on that day, he assigned these leases, with the approval of the commissioner, to confidential employees who, in fact, held the same solely for the benefit of the said E. H. Bendiksen.

Oyster-bed lease No. 140 expired July 26, 1950. It had previously been issued to defendant Myron T. Heuston, by him assigned to the Long Island Oyster Company, a corporation, and by it assigned to defendant Bendiksen.

July 28, 1950, plaintiff wife made application to the commissioner for a lease upon the same land. August 10, 1950 (within thirty days of expiration), defendant Heuston, having an assignment from defendant Bendiksen and the Long Island Oyster Company, applied for a renewal of the lease.

The commissioner rejected the application of plaintiff wife and issued the lease to defendant Heuston. With the commissioner's approval, Heuston assigned the lease to Betty J. Esveldt, wife of Bendiksen's cannery superintendent, who "is acting solely for the benefit of the defendant E. H. Bendiksen."

It was alleged that defendant Heuston,

". . . for more than 10 years past had no interest in the cultivation, farming, or production of oysters and was acting solely for and on behalf of the said defendant E. H. Bendiksen."

It is not necessary, for the purpose of discussing the questions determinative of this action, to detail the allegations of the lease transactions of defendants Lafromboise and Farmer who later intervened in the action.

The theory of plaintiffs' complaint is that defendant Bendiksen

". . . evolved a scheme or plan to obtain and own some six leases totaling much more than 40 acres, and induced the above-named defendants, except A. A. Lafromboise and L. L. Farmer, to enter into a conspiracy with him to carry out the said scheme or plan, and the said defendants did aid and assist him in so doing . . ."

It is further alleged that defendant Taylor, as commissioner of public lands of this state, was fully advised as to the facts constituting this "scheme" and had agreed to hold a public hearing thereon

". . . but thereafter arbitrarily, capriciously, and fraudulently approved the applications [of defendants] . . . without any public hearing or investigation, all as a part of the same general plan and conspiracy . . ."

All of the defendants, except Taylor, Farmer, and Lafromboise, demurred to the complaint. Farmer and Lafromboise filed an answer and petition in intervention. The state attorney general filed an appearance for the commissioner of public lands. The demurrer having been sustained, this appeal is from a judgment dismissing the action.

This action deals with the right of the commissioner of public lands to *renew* an oyster bed lease. Renewal of such leases is governed by Rem. Rev. Stat., § 7797-146 (Laws of 1927, chapter 255, § 146, p. 548), which provides:

"The commissioner of public lands may, upon the filing of an application for a renewal lease, cause the lands to be inspected, and if he deem it for the best interests of the state to re-lease said lands, he shall issue to the applicant a renewal lease for such further period not exceeding twenty years and under such terms and conditions as may be determined by the commissioner. In case of an application for a renewal lease it shall not be necessary for the lands to be inspected and reported upon by the director of fisheries and game." [*cf.* RCW 79.20.050]

It follows that the statutes (Rem. Rev. Stat., §§ 7797-143, 7797-144, 7797-145, 7797-147) which apply to *original leasing* of oyster bed lands do not apply to the instant case.

Do plaintiffs, as unsuccessful applicants, have the capacity to maintain this action to set aside renewal leases for oyster beds issued to the successful renewal applicants, on the ground of fraud?

In *State ex rel. Clithero v. Showalter,* 159 Wash. 519, 521, 293 Pac. 1000, we said:

"It is well settled law that a private citizen or taxpayer, as such, cannot maintain a suit to restrain or coerce a particular course of action on the part of a state officer or board, unless he shows a direct, special and pecuniary injury to himself, separate and distinct from that suffered by the general public, the *Attorney General* having the sole right to maintain such an action in the interests of the public. [Citing cases.]"

In order to maintain an action such as this, the plaintiff must have some real, substantial interest, as distinguished from a mere expectancy or contingent benefit; and must show that if the relief requested is granted, he will, of necessity, be benefited. Appellants (plaintiffs) cannot show this. Public wrongs or breach of public duty cannot be redressed in a suit in the name of an individual whose interests in the right asserted does not differ from that of the public generally. *State ex rel. Gebhardt v. Superior Court,* 15 Wn. (2d) 673, 131 P. (2d) 943.

Plaintiffs contend that they have a real and substantial interest sufficient to maintain this action because of their applications for the leases. However, plaintiffs are not in any different position under the oyster-bed lease statutes than is a lease applicant for any other type of state-owned land. In *State ex rel. Pelton v. Ross,* 39 Wash. 399, 408, 81 Pac. 865, we said:

"The mere filing of a written application for a lease of public lands does not confer upon the applicant any interest in the land other than that of the general public. *Allen v. Forrest,* 8 Wash. 700, 36 Pac. 971, 24 L. R. A. 606."

Since the lands had already been leased as oyster beds, plaintiffs' application was in fact a request for a renewal of the lease to them. This application gave them no right superior to any other applicant. Renewing the lease is still a matter of discretion with the commissioner.

The trial judge held that our decision in *Powers v. Webster,* 47 Wash. 99, 101, 91 Pac. 569, is determinative of this case. Therein, we said:

"The first object of the action is to set aside the deed from the state to respondent Croft. If the deed of the state is set aside the property reverts to the state. Therefore the state is a necessary party to such an action. The action cannot be maintained at the suit of a private person who has no interest in the property. [Citing authorities.]

"In the case of *St. Louis Smelting Co. v. Kemp, supra,* [104 U. S. 636, 26 L. Ed. 875], the court said:

" 'If in issuing a patent its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must report to a court of equity for relief, *and even there his complaint cannot be heard unless he connect himself with the original source of title,* so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands. *Boggs v. Merced Mining Co.,* 14 Cal. 279, 363. *It does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it.* If the government is dissatisfied it can, on its own account, authorize proceedings to vacate the patent or limit its operation.' " (Italics ours.)

Plaintiffs attempt to distinguish the *Powers* case on the ground that these leases are void by virtue of Laws of 1927, chapter 255, § 60, p. 497 (Rem. Rev. Stat., § 7797-60), which provides:

"Any sale or lease of state lands, except capitol building lands, or of tide or shore lands, made by mistake, or not in accordance with law, or obtained by fraud or misrepresentation, shall be void, . . . " [*cf.* RCW 79.12.280]

leaving to inference that the deed in the *Powers* case was not void. This is not a ground for distinction. Although

not cited in the opinion, the statute in force when the facts alleged in the *Powers* case occurred, made such sales "void" when obtained by fraud. Rem. and Bal. Code § 6680 (1910). Our holding in the *Powers* case has been cited with approval in *State ex rel. Clithero v. Showalter, supra.*

Setting aside the renewal leases, as requested by plaintiffs, would still leave a subsequent renewal of the leases a matter of discretion with the commissioner of public lands. Plaintiffs are not the ones to maintain this action.

The judgment is affirmed.

MALLERY, SCHWELLENBACH, HILL, HAMLEY, DONWORTH, FINLEY, and OLSON, JJ., concur.

GRADY, C. J. (dissenting)—I am unable to concur in the conclusions reached by the majority opinion. The fundamental error voiced by the opinion, as I view it, is in attempting to draw an analogy between the statutes relating to the sale and leasing of school lands and those relating to tidelands· upon which there are not natural beds of oysters, but upon which oysters can be propagated if planted. I think a portrayal of the history of the two subjects and a consideration of the different public policies involved, will so demonstrate. In my discussion, I shall refer to this special type of public lands as "oyster lands."

The public policy relating to oyster lands was adopted by the territorial legislature in 1873, while that relating to school lands was adopted after statehood. The basis of the former was the encouragement of oyster propagation on those tidelands where oysters had to be artificially planted, thereby putting the lands to beneficial use, furnishing a vocation for individuals and the creation of a food product, while that of the latter was to secure revenue when needed to support the common schools.

The act of 1873, entitled "An Act to Encourage the Cultivation of Oysters," indicates that the territorial legislature considered it good public policy to encourage the cultivation of oysters by the use of those tidelands upon which there were not natural beds of oysters, but upon which oysters could be propagated. In order to carry out such

policy, the act provided that any citizen of the territory who had planted or might thereafter plant oysters in any bay or arm of the sea where there were no natural beds of oysters might acquire by conforming to the requirements of the act an exclusive right for such a purpose to that portion of such bay or arm of the sea as he should so occupy, not exceeding for any one person an area of ten acres. The person desiring the benefits of the act was required to locate the place or portion of tidelands he desired to claim by marking the area so far as practicable with stakes or other artificial marks; also to make an affidavit that he had taken the premises described for the purpose of planting oysters, that he had planted or was about to plant oysters thereon, that the premises were not upon and did not include any natural bed of oysters, and that they were unoccupied except by himself.

Section 3 of the act provided:

"The premises so taken shall, for the purposes aforesaid, belong to the person taking them, his heirs and assigns, so long as he or they shall so occupy them and no longer."

Section 5 provided:

"Any person may transfer his right to any other person qualified to hold, by signing the transfer upon record in the presence of the auditor, or by a written transfer, witnessed and acknowledged in the same (way) as is or may be required for deeds."

At this juncture, it is important to have in mind the right, title, or interest which a qualified person acquires when he complies with statutory requirements. Throughout all legislation on the subject, both territorial and state, a substantial property right has been acquired though the method has been changed with reference to what one must do in a procedural way to acquire such property right.

If some right, title, or interest is acquired by compliance with the statute so that a denial thereof by the land commissioner causes the holder thereof to sustain some direct, special, and pecuniary injury to himself separate and distinct from that suffered by the general public, then he has

the capacity to sue such public official to vindicate that right.

It seems clear to me that the lands selected under the act of 1873 became the property of the selector just the same as if he had received a deed therefor, subject to automatic defeasance if he ceased to occupy them. The fact that the lands descended to his heirs, and that he had the right to transfer them, must lead one to such a conclusion.

I think it is safe to say that if the auditor accepted and recorded the affidavit of some subsequent claimant, the one who had acquired the right to the land could maintain an action against the auditor and join the claimant therein to avoid the effect of the affidavit and cause it to be canceled of record, so that his affidavit might be legally filed, and that the doctrine later pronounced by *Powers v. Webster,* 47 Wash. 99, 91 Pac. 569, would not have been regarded as applicable.

The method of acquiring the right to plant and cultivate oysters, as provided by the act of 1873, continued in effect until the passage of chapter 255, Laws of 1927. The later act relates to the selection, control, management, sale, and disposition of lands belonging to or held in trust by the state, and legislates with reference to both school lands and oyster lands. Sections 142 to 149, inclusive, relate to the kind of oyster lands under consideration. Section 201 of the act contains a savings clause preserving the rights of existing holders of oyster lands. These sections of the act preserve and carry forward the same public policy voiced by the territorial legislature—encouraging the planting and cultivating of oysters upon those tidelands not covered by natural oyster beds.

It now remains to be seen whether a person who complies with statutory requirements, acquires such a right to a lease as will enable him to maintain an action against the commissioner of public lands and others to protect and enforce the same.

The principal change made in the former law was that, instead of transferring a conditional title to the oyster lands,

the state provided for the leasing of such lands. Under the act of 1927, one desiring to plant and cultivate oysters may file with the commissioner of public lands a written application accompanied by a map indicating the land desired to be leased and making and causing to be recorded an affidavit that he has taken the premises so described for the purpose of planting oysters. The director of fisheries is required to ascertain whether the land is a natural oyster bed, whether such land or any part thereof has been a natural oyster bed within ten years last past or may be reasonably expected to again become such within ten years in the future; also, whether it is necessary in order to secure adequate protection for any natural oyster bed to retain the lands described in the application for lease or any part thereof. If these factors do not exist, the statute enjoins upon the commissioner of public lands the mandatory duty to issue to the applicant a lease for such lands for a term not exceeding twenty years and at such annual rental as may be fixed and determined by the commissioner.

It seems to me that, when a qualified person files his application and map with the commissioner, and the lands covered are in fact leasable, he then becomes possessed of the right to be given a lease which he may protect by an appeal to the courts if such right is denied or invaded, even though it be by the land commissioner and those conspiring with him.

Upon the expiration of a lease, the lessee has the right to renew the same. When he seeks such renewal, the commissioner must inspect the lands to determine if they are still artificial oyster lands.

At this point in the statute, language is used which the majority opinion construes to mean that a renewal of a lease is wholly discretionary with the commissioner. The commissioner is required upon the application for a renewal to "cause the lands to be inspected." It further provides that when the application for renewal is made, "it shall not be necessary for the lands to be inspected and reported upon by the director of fisheries"; also that

". . . if he deem it for the best interests of the state to re-lease said lands, he shall issue to the applicant a renewal lease for such further period not exceeding twenty years and under such terms and conditions as may be determined by the commsisioner."

When we consider the policy of the law from its territorial inception, we find that it has been regarded "for the best interests of the state" that the continued planting and cultivating of oysters be encouraged, provided such activity does not interfere with the rights of others specially protected by statute; that such activity be conducted by only those having the qualifications prescribed by statute and in amounts and area of lands limited by statute; and that the lands are not, nor may be reasonably expected to again become natural oyster beds within ten years in the future. These are the enumerated matters and things in which the state is interested so far as the rights of parties are concerned, and when it is found that none of them is inconsistent with the planting and cultivating of artificial oyster beds, it must follow that the best interests of the state will be served by renewing leases because of the declared public policy to encourage oyster planting. The commissioner has more to do than merely exercise a discretion, as that term is popularly understood—a duty is cast upon him which he must perform.

In the case of selling and leasing school lands, we have an entirely different situation. The school lands were granted to the state by the Federal government in order that the state might obtain revenue to support its common schools by selling and leasing such lands. An applicant to purchase or lease such lands is not given by statute any right or interest therein by indicating his desire to purchase or lease and taking possession thereof, or by filing application therefor, as in the case of oyster lands. All he does by making application to purchase or lease is to start administrative machinery in motion which may result, but not necessarily, in a sale at public auction or the execution of a lease. Inasmuch as the commissioner of public lands has discretion whether he will sell or lease any particular land at any

particular time, it necessarily follows that no justiciable rights are acquired by an applicant prior to his becoming a grantee or lessee; and this is why we decided in *State ex rel. Pelton v. Ross*, 39 Wash. 399, 81 Pac. 865, and *Powers v. Webster*, 47 Wash. 99, 91 Pac. 569 (which furnish the basis for the decision by the majority on the question of capacity to sue), that an applicant to purchase state lands or to lease the same has no interest other than that of the general public, and therefore cannot maintain an action against the commissioner of public lands. The rule is a very salutary one and seems to protect public officials against harassment and annoyance by litigation instituted by busybodies who have no other purpose to serve.

It is my view that the cases just cited were correctly decided. I do not think they apply to the situation now before us. My opinion is that appellants acquired such an interest in the subject matter of this action as to give them capacity to sue the land commissioner to cancel leases or renewals of leases which collectively placed a party in possession or control over a greater area of oyster lands than he was lawfully entitled to possess or control, and thereby, in effect, prevent a qualified person from initiating and acquiring a right to a lease to some of them.

The allegations of the complaint, which we must accept as true upon demurrer, show that the commissioner of public lands (not the present commissioner) violated his statutory duty when he enabled a party by means of leases and renewals to and through "dummies" to acquire a greater area of oyster lands than the statute permits and sought thereby to deprive appellants of the rights they had acquired by compliance with the statutes to obtain leases to some of such lands.

I am of the opinion that appellants have the capacity to maintain this action, and that their complaint states a cause of action. I would reverse the judgment and remand the case for further proceedings.