2014 MAR 31 PM 12: 04


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CANNABIS ACTION COALITION, ARTHUR WEST, | ) ) ) | DIVISION ONE |
| Plaintiffs, | ) ) | No. 70396-0-I (Consolidated with |
| STEVE SARICH, JOHN WORTHINGTON, and DERYCK TSANG, | ) ) ) ) | No. 69457-0-I) |
| Appellants, | ) ) | |
| v. | ) ) | |
| CITY OF KENT, a local municipal corporation, | ) ) ) | PUBLISHED OPINION |
| Respondent. | ) ) | FILED: March 31, 2014 |

DWYER, J. — The Washington Constitution grants the governor the power to veto individual sections of a bill. The governor may exercise this power even when doing so changes the meaning or effect of the bill from that which the legislature intended. As a corollary of this power, when the governor's sectional veto alters the intent of the bill and the legislature does not override the veto, the governor's veto message becomes the exclusive statement of legislative intent that speaks directly to the bill as enacted into law.

In this case, the governor vetoed over half of the sections in a 2011 bill amending the Washington State Medical Use of Cannabis Act[1] (MUCA), substantially changing the meaning, intent, and effect of the bill. Although Engrossed Second Substitute Senate Bill (ESSSB) 5073 was originally designed to legalize medical marijuana through the creation of a state registry of lawful users, as enacted it provides medical marijuana users with an affirmative defense to criminal prosecution.

Following the governor's sectional veto and the new law's effective date, the City of Kent enacted a zoning ordinance which defined medical marijuana "collective gardens" and prohibited such a use in all zoning districts. By so doing, Kent banned collective gardens.

An organization and several individuals (collectively the Challengers) brought a declaratory judgment action challenging the ordinance. The Challengers claimed that ESSSB 5073 legalized collective gardens and that Kent was thus without authority to regulate or ban collective gardens. In response, Kent sought an injunction against the individual challengers enjoining them from violating the ordinance. The superior court ruled in favor of Kent, dismissed the Challengers' claims for relief, and granted the relief sought by Kent.

We hold that neither the plain language of the statute nor the governor's intent as expressed in her veto message supports a reading of ESSSB 5073 that legalizes collective gardens. The Kent city council acted within its authority by enacting the ordinance banning collective gardens. Accordingly, the trial court

---

[1] Ch. 69.51A RCW.

did not err by dismissing the Challengers' actions and granting relief to Kent.

I

In 2011, the Washington legislature adopted ESSSB 5073, which was intended to amend the MUCA.[2] The bill purported to create a comprehensive regulatory scheme, whereby—with regard to medical marijuana—all patients, physicians, processors, producers, and dispensers would be registered with the state Department of Health. The legislature's intended purpose in amending the statute, as stated in section 101 of the bill, was so that

> (a) Qualifying patients and designated providers complying with the terms of this act and registering with the department of health will no longer be subject to arrest or prosecution, other criminal sanctions, or civil consequences based solely on their medical use of cannabis;
> (b) Qualifying patients will have access to an adequate, safe, consistent, and secure source of medical quality cannabis; and
> (c) Health care professionals may authorize the medical use of cannabis in the manner provided by this act without fear of state criminal or civil sanctions.

ENGROSSED SECOND SUBSTITUTE S. B. (ESSSB) 5073, § 101, 62nd Leg., Reg. Sess. (Wash. 2011) (italics and boldface omitted). The legislature also amended RCW 69.51A.005, the MUCA's preexisting purpose and intent provision, to state, in relevant part:

> Qualifying patients with terminal or debilitating medical conditions who, in the judgment of their health care professionals, may benefit from the medical use of cannabis, shall not be arrested, prosecuted, or subject to other criminal sanctions or civil consequences under state law based solely on their medical use of

_____

[2] The MUCA, as it existed prior to the 2011 legislative session, was a product of Initiative Measure No. 692 passed by the voters in the 1998 general election and subsequently codified as chapter 69.51A RCW. The MUCA was amended in 2007 and 2010 in manners not pertinent to the issues presented herein. LAWS OF 2007, ch. 371; LAWS OF 2010, ch. 284.

cannabis, notwithstanding any other provision of law. ESSSB 5073, § 102.

As drafted by the legislature, ESSSB 5073 established a state-run registry system for qualified patients and providers. Significantly, section 901 of the bill required the state Department of Health, in conjunction with the state Department of Agriculture, to "adopt rules for the creation, implementation, maintenance, and timely upgrading of a secure and confidential registration system." ESSSB 5073, § 901(1). Patients would not be required to register; rather, the registry would be "optional for qualifying patients." ESSSB 5073, § 901(6). On the one hand, if a patient was registered with the Department of Health, he or she would not be subject to prosecution for marijuana-related offenses.[3] ESSSB 5073, § 405. On the other hand, if a patient did not register, he or she would be entitled only to an affirmative defense to marijuana-related charges.[4] ESSSB 5073, § 406.

The bill also allowed qualified patients to establish collective gardens for the purpose of growing medical marijuana for personal use.[5] ESSSB 5073,

---

[3] This section of the bill is now codified as follows:
The medical use of cannabis in accordance with the terms and conditions of this chapter does not constitute a crime and a qualifying patient or designated provider in compliance with the terms and conditions of this chapter may not be arrested, prosecuted, or subject to other criminal sanctions or civil consequences, for possession, manufacture, or delivery of, or for possession with intent to manufacture or deliver, cannabis under state law, or have real or personal property seized or forfeited for possession, manufacture, or delivery of, or for possession with intent to manufacture or deliver, cannabis under state law, and investigating peace officers and law enforcement agencies may not be held civilly liable for failure to seize cannabis in this circumstance.
RCW 69.51A.040.
[4] This section is now codified as RCW 69.51A.043(1), which states, "A qualifying patient or designated provider who is not registered with the registry established in *section 901 of this act may raise the affirmative defense."
[5] Now codified as RCW 69.51A.085, this section provides:

§ 403. Furthermore, even though the bill purported to legalize medical marijuana for registered patients and providers, it nevertheless granted authority to municipalities to regulate medical marijuana use within their territorial confines. Section 1102, now codified as RCW 69.51A.140, provides in relevant part:

> (1) Cities and towns may adopt and enforce any of the following pertaining to the production, processing, or dispensing of cannabis or cannabis products within their jurisdiction: Zoning requirements, business licensing requirements, health and safety requirements, and business taxes. Nothing in this act is intended to limit the authority of cities and towns to impose zoning requirements or other conditions upon licensed dispensers, so long as such requirements do not preclude the possibility of siting licensed dispensers within the jurisdiction. If the jurisdiction has no commercial zones, the jurisdiction is not required to adopt zoning to accommodate licensed dispensers.

ESSSB 5073, § 1102.

---

(1) Qualifying patients may create and participate in collective gardens for the purpose of producing, processing, transporting, and delivering cannabis for medical use subject to the following conditions:
    (a) No more than ten qualifying patients may participate in a single collective garden at any time;
    (b) A collective garden may contain no more than fifteen plants per patient up to a total of forty-five plants;
    (c) A collective garden may contain no more than twenty-four ounces of useable cannabis per patient up to a total of seventy-two ounces of useable cannabis;
    (d) A copy of each qualifying patient's valid documentation or proof of registration with the registry established in *section 901 of this act, including a copy of the patient's proof of identity, must be available at all times on the premises of the collective garden; and
    (e) No useable cannabis from the collective garden is delivered to anyone other than one of the qualifying patients participating in the collective garden.
    (2) For purposes of this section, the creation of a "collective garden" means qualifying patients sharing responsibility for acquiring and supplying the resources required to produce and process cannabis for medical use such as, for example, a location for a collective garden; equipment, supplies, and labor necessary to plant, grow, and harvest cannabis; cannabis plants, seeds, and cuttings; and equipment, supplies, and labor necessary for proper construction, plumbing, wiring, and ventilation of a garden of cannabis plants.
    (3) A person who knowingly violates a provision of subsection (1) of this section is not entitled to the protections of this chapter.

The bill was passed by both houses of the legislature and sent to Governor Gregoire for her signature.

On April 14, 2011, the United States Attorneys for the Eastern and Western Districts of Washington wrote an advisory letter to Governor Gregoire regarding ESSSB 5073. Therein, the district attorneys explained the Department of Justice's position on the bill:

> The Washington legislative proposals will create a licensing scheme that permits large-scale marijuana cultivation and distribution. This would authorize conduct contrary to federal law and thus, would undermine the federal government's efforts to regulate the possession, manufacturing, and trafficking of controlled substances. . . . In addition, state employees who conducted activities mandated by the Washington legislative proposals would not be immune from liability under the CSA.[6] Potential actions the Department could consider include injunctive actions to prevent cultivation and distribution of marijuana and other associated violations of the CSA; civil fines; criminal prosecution; and the forfeiture of any property used to facilitate a violation of the CSA.

After receiving this missive, Governor Gregoire vetoed all sections of the bill which might have subjected state employees to federal charges. The governor vetoed 36 sections[7] of the bill that purported to establish a state registry, including section 901, and including section 101, the legislature's statement of intent. LAWS OF 2011, ch. 181. The governor left intact those sections of the bill that did not create or were not wholly dependent on the creation of a state registry. LAWS OF 2011, ch. 181. In her official veto message, Governor Gregoire explained her decision to leave parts of the bill intact:

---

[6] Controlled Substances Act, Title 21 U.S.C., Ch. 13.
[7] The bill contained 58 sections as passed by the legislature. The governor vetoed 36 of those sections.

-6-

Today, I have signed sections of Engrossed Second Substitute Bill 5073 that retain the provisions of Initiative 692 and provide additional state law protections. Qualifying patients or their designated providers may grow cannabis for the patient's use or participate in a collective garden without fear of state law criminal prosecutions. Qualifying patients or their designated providers are also protected from certain state civil law consequences.

LAWS OF 2011, ch. 181, governor's veto message at 1374-75.

The governor recognized that her extensive exercise of the sectional veto power rendered meaningless any of the bill's provisions that were dependent upon the state registry, noting that "[b]ecause I have vetoed the licensing provisions, I have also vetoed" numerous other sections. LAWS OF 2011, ch. 181, governor's veto message at 1375. However, the governor also recognized that— after her extensive vetoes—portions of some sections would remain meaningful even though references to the registry within those sections would not. Importantly, in one particular example, the governor stated:

I am not vetoing Sections 402 or 406, which establish affirmative defenses for a qualifying patient or designated provider who is not registered with the registry established in section 901. Because these sections govern those who have not registered, this section is meaningful even though section 901 has been vetoed.

LAWS OF 2011, ch. 181, governor's veto message at 1376. Another section that the governor believed to have meaning, even though it referenced registered entities, was section 1102. With respect to this section, the governor stated:

Section 1102 sets forth local governments' authority pertaining to the production, processing or dispensing of cannabis or cannabis products within their jurisdictions. The provisions in Section 1102 that local governments' zoning requirements cannot "preclude the possibility of siting licensed dispensers within the jurisdiction" are without meaning in light of the vetoes of sections providing for such licensed dispensers. It is with this understanding that I approve

section 1102.

LAWS OF 2011, ch. 181, governor's veto message at 1375. The bill, now consisting only of the 22 sections not vetoed by the governor, was signed into law and codified in chapter 69.51A RCW. The legislature did not override the governor's veto.

Subsequently, Kent sought to exercise its zoning power to regulate collective gardens. On July 5, 2011 and January 3, 2012, Kent issued six month moratoria prohibiting collective gardens within the city limits. On June 5, 2012, Kent enacted Ordinance No. 4036 (the Ordinance), defining collective gardens and banning them within the city limits. The Ordinance states, in relevant part:

> A. *Collective gardens*, as defined in KCC 15.02.074, are prohibited in the following zoning districts:
>
> 1. All agricultural districts, including A-10 and AG;
>
> 2. All residential districts, including SR-1, SR-3, SR-4.5, SR-6, SR-8, MR-D, MR-T12, MR-T16, MR-G, MR-M, MR-H, MHP, PUD, MTC-1, MTC-2, and MCR;
>
> 3. All commercial/office districts, including: NCC, CC, CC-MU, DC, DCE, DCE-T, CM-1, CM-2, GC, GC-MU, O, O-MU, and GWC;
>
> 4. All industrial districts, including: MA, M1, M1-C, M2, and M3; and
>
> 5. Any new district established after June 5, 2012.
>
> B. Any violation of this section is declared to be a public nuisance per se, and shall be abated by the city attorney under applicable provisions of this code or state law, including, but not limited to, the provisions of KCC Chapter 1.04.

Thereafter, the Cannabis Action Coalition, Steve Sarich, Arthur West, John Worthington, and Deryck Tsang filed suit against Kent, seeking declaratory,

injunctive, and mandamus relief.[8] Worthington, Sarich, and West stated in their complaint that they intended to participate in a collective garden in Kent. None of the three, however, actually resided in, owned or operated a business in, or participated in a collective garden in Kent. Tsang, on the other hand, is a resident of Kent and currently participates in a collective garden in the city limits.

In the superior court proceeding, the parties filed competing motions for summary judgment. After considering all documentation submitted by the parties, the trial court ruled in favor of Kent. The trial court dismissed the claims of Cannabis Action Coalition, Sarich, West, and Worthington for lack of standing.[9] On the merits of Tsang's claims, the trial court held that "[t]he Kent City Council had authority to pass Ordinance 4036, Ordinance 4036 is not preempted by state law, and Ordinance 4036 does not violate any constitutional rights of Plaintiffs." The trial court also granted Kent's request for a permanent injunction against all plaintiffs, prohibiting them from violating the Ordinance.

The Challengers appealed to the Washington Supreme Court and requested a stay of the injunction. The Supreme Court Commissioner granted the stay. While the appeal was pending, Kent filed a motion to strike portions of Worthington's reply brief, which Worthington countered with a motion to waive Rule of Appellate Procedure (RAP) 10.3(c).[10] The Supreme Court transferred

---

[8] The Cannabis Action Coalition is no longer a party to this matter. Although West filed a notice of appeal, he never filed an appellate brief; he has thus abandoned his appeal.

[9] However, the trial court stated that "even if all plaintiffs do have standing," its motion granting summary judgment in favor of Kent was "dispositive as to all plaintiffs."

[10] Kent asserts that the majority of Worthington's reply brief should be stricken because they contain arguments not raised in the trial court, they contain arguments not raised in Worthington's opening brief, and they are not in response to Kent's brief. Worthington contends

the appeal to this court, along with the two unresolved motions.

II

A

The Challengers contend that the plain language of the MUCA legalizes collective gardens.[11] This is so, they assert, because the MUCA provides that

---

that this court should waive RAP 10.3(c) and that his entire reply brief should be considered in order to "meet the ends of justice and facilitate a ruling on the merits."

RAP 10.3(c) provides that, "[a] reply brief should conform with subsections (1), (2), (6), (7), and (8) of section (a) and be limited to a response to the issues in the brief to which the reply brief is directed." "A reply brief is generally not the proper forum to address new issues because the respondent does not get an opportunity to address the newly raised issues." City of Spokane v. White, 102 Wn. App. 955, 963, 10 P.3d 1095 (2000) (citing RAP 10.3(c); Dykstra v. Skagit County, 97 Wn. App. 670, 676, 985 P.2d 424 (1999)).

Sections A, C, G, and I of Worthington's reply brief all consist of arguments not previously raised or are premised on facts not in the record. Kent's motion is granted with respect to these sections. Kent's motion is denied with respect to sections B, D, and H.

Kent additionally moved to strike all appendices to Worthington's reply brief. "An appendix may not include materials not contained in the record on review without permission from the appellate court, except as provided in rule 10.4(c)." RAP 10.3(a)(8).

Appendix D does not appear in the record, nor did Worthington seek permission from the Supreme Court to include materials not contained in the record. We therefore grant Kent's motion to strike appendix D. Kent's motion is denied with respect to Appendices A and C.

Appendix B is a copy of an unpublished federal district court decision, which Worthington cited in support of his argument in section G. As we have already stricken section G, we have no basis to consider the material in Appendix B. Kent's motion with respect to this appendix is thus moot.

Worthington contends that we should waive RAP 10.3(c) and nevertheless consider sections A, C, G, I, and Appendices B and D. RAP 18.8(a) allows this court to waive any of the RAPs "in order to serve the ends of justice." In addition to Worthington's opening brief, this court has received briefing from Sarich, Tsang, Kent, and two amici curiae. Accordingly, it is not necessary to consider Worthington's new arguments "in order to serve the ends of justice" in this case. Worthington's motion is denied.

[11] As an initial matter, Kent claims that Sarich and Worthington lack standing to assert these arguments. However, in the trial court, Kent sought and was granted affirmative relief against all plaintiffs, including Sarich and Worthington. Because Sarich and Worthington are now subject to a permanent injunction, they both have standing on appeal. Orion Corp. v. State, 103 Wn.2d 441, 455, 693 P.2d 1369 (1985); see also Casey v. Chapman, 123 Wn. App. 670, 676, 98 P.3d 1246 (2004) ("Parties whose financial interests are affected by the outcome of a declaratory judgment action have standing."). Moreover, as soon as Kent sought affirmative relief against them in the trial court, their standing was established. Vovos v. Grant, 87 Wn.2d 697, 699, 555 P.2d 1343 (1976) ("A person has standing to challenge a court order or other court action if his protectable interest is adversely affected thereby.") The critical question is whether "if the relief requested is granted," will the litigants' protectable interests be affected. Herrold v. Case, 42 Wn.2d 912, 916, 259 P.2d 830 (1953); cf. Snohomish County Bd. of Equalization v. Dep't of Revenue, 80 Wn.2d 262, 264-64, 493 P.2d 1012 (1972) ("Without a decision of this court, [the

"[q]ualifying patients may create and participate in collective gardens." RCW 69.51A.085(1). Kent, in response, contends that the plain language of the MUCA did not legalize collective gardens because collective gardens would only have been legalized in circumstances wherein the participating patients were duly registered, and the registry does not exist. The trial court properly ruled that Kent is correct.

We review issues of statutory interpretation de novo. Fiore v. PPG Indus., Inc., 169 Wn. App. 325, 333, 279 P.3d 972 (2012). "The goal of statutory interpretation is to discern and carry out legislative intent." Bennett v. Seattle Mental Health, 166 Wn. App. 477, 483, 269 P.3d 1079, review denied, 174 Wn.2d 1009 (2012). "The court must give effect to legislative intent determined 'within the context of the entire statute.'" Whatcom County v. City of Bellingham, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996) (quoting State v. Elgin, 118 Wn.2d 551, 556, 825 P.2d 314 (1992)). "If the statute's meaning is plain on its face, we give effect to that plain meaning as the expression of what was intended." TracFone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010) (citing Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). "In approving or disapproving legislation, the governor acts in a legislative capacity and as part of the legislative branch of government." Hallin v. Trent, 94 Wn.2d 671, 677, 619 P.2d 357 (1980). Accordingly, when the governor

---

plaintiffs] were placed in a position of making a determination of a difficult question of constitutional law with the *possibility of facing both civil and criminal penalties* if they made the wrong choice. One of the purposes of declaratory judgment laws is to give relief from such situations." (emphasis added) (footnotes omitted)).

vetoes sections of a bill, the governor's veto message is considered a statement of legislative intent. Dep't of Ecology v. Theodoratus, 135 Wn.2d 582, 594, 957 P.2d 1241 (1998).

The plain language of ESSSB 5073, as enacted, does not legalize medical marijuana or collective gardens. Subsection (1) of RCW 69.51A.085 delineates the requirements for collective gardens. RCW 69.51A.085 further provides that "[a] person who knowingly violates a provision of subsection (1) of this section is not entitled to the protections of this chapter." RCW 69.51A.085(3).

The "protections of this chapter" to which RCW 69.51A.085(3) refers are found in RCW 69.51A.040 and 69.51A.043. RCW 69.51A.040 provides that "[t]he medical use of cannabis in accordance with the terms and conditions of this chapter does not constitute a crime" if the patient meets the six listed requirements. One of the listed requirements is that

> The qualifying patient or designated provider keeps a copy of his or her *proof of registration with the registry established in *section 901 of this act* and the qualifying patient or designated provider's contact information posted prominently next to any cannabis plants, cannabis products, or useable cannabis located at his or her residence.

RCW 69.51A.040(3) (emphasis added). Therefore, in order to obtain the protections provided by RCW 69.51A.040, the patient must be registered with the state.

RCW 69.51A.043, on the other hand, delineates the protections for patients who are not registered:

> *(1) A qualifying patient or designated provider who is not registered with the registry established in *section 901 of this act*

*may raise the affirmative defense set forth in subsection (2) of this section, if:*

(a) The qualifying patient or designated provider presents his or her valid documentation to any peace officer who questions the patient or provider regarding his or her medical use of cannabis;

(b) The qualifying patient or designated provider possesses no more cannabis than the limits set forth in RCW 69.51A.040(1);

(c) The qualifying patient or designated provider is in compliance with all other terms and conditions of this chapter;

. . .

(2) *A qualifying patient or designated provider who is not registered with the registry established in \*section 901 of this act, but who presents his or her valid documentation to any peace officer who questions the patient or provider regarding his or her medical use of cannabis, may assert an affirmative defense to charges of violations of state law relating to cannabis through proof at trial, by a preponderance of the evidence, that he or she otherwise meets the requirements of RCW 69.51A.040.* A qualifying patient or designated provider meeting the conditions of this subsection but possessing more cannabis than the limits set forth in RCW 69.51A.040(1) may, in the investigating peace officer's discretion, be taken into custody and booked into jail in connection with the investigation of the incident.

(Emphasis added.) Section 901 of ESSSB 5073, referred to in both RCW 69.51A.040 and 69.51A.043, was vetoed. As a result of the governor's veto, the state registry does not exist. Thus, it is impossible for an individual to be registered with the registry. Accordingly, no individual is able to meet the requirements of RCW 69.51A.040.

Pursuant to RCW 69.51A.043, patients who are *not registered* may be entitled to an affirmative defense. As we hold today in State v. Reis, No. 69911-3-I, slip op. at 11 (Wash. Ct. App. Mar. 31, 2014), "by default, qualifying patients and designated providers are entitled only to an affirmative defense." As such, the only available "protection" to which collective garden participants are entitled pursuant to RCW 69.51A.085(3) is an affirmative

- 13 -

defense to prosecution.

Although such a reading may appear to render RCW 69.51A.040 meaningless, it does not, in fact, do so. RCW 69.51A.040 delineates the non-registry related conditions for possessing medical marijuana. These conditions are referenced in RCW 69.51A.043[12] and are essential components of the affirmative defense. Thus, the plain language of the statute does not legalize the use of medical marijuana.[13] Instead, it provides a defense to an assertion that state criminal laws were violated. As such, medical marijuana use, including collective gardens, was not legalized by the 2011 amendments to the MUCA.

B

All parties contend that the legislative history of ESSSB 5073 supports their reading of the Act. In order to analyze the legislative history of ESSSB 5073 as enacted, however, we must first determine which sources of legislative intent are proper for us to consider. For the reasons that follow, we hold that the

---

[12] "(b) The qualifying patient or designated provider possesses no more cannabis than the limits set forth in RCW 69.51A.040(1); (c) The qualifying patient or designated provider is in compliance with all other terms and conditions of this chapter." RCW 69.51A.043(1).

[13] In State v. Kurtz, 178 Wn.2d 466, 476, 309 P.3d 472 (2013), the Supreme Court briefly stated in dicta, "[I]n 2011 the legislature amended the Act making qualifying marijuana use a legal use, not simply an affirmative defense." As authority for this assertion, the court cited RCW 69.51A.005. RCW 69.51A.005, a preexisting provision entitled "Purpose and intent," was amended by the legislature in ESSSB 5073, section 102. Section 102 was included in the bill as passed by both houses of the legislature and accurately expresses the intent of the original bill. While the governor did not veto section 102, the governor's veto of numerous other sections of the bill significantly changed the bill's purpose. Additionally, the governor *did* veto section 101, a new statement of legislative purpose quoted, supra, at 3. Moreover, the parties in Kurtz did not address this question in their briefing to the Supreme Court and the court's footnoted statement was not important to its holding. Thus, we do not view this statement in Kurtz as controlling the outcome of this litigation. In our decision in Reis, No. 69911-3-I, we further explain our view in this regard.

governor's veto message is the sole source of relevant legislative history on the 2011 amendments to the MUCA, as enacted.

Article III, section 12 of the Washington Constitution allows for the governor to veto "one or more sections . . . while approving other portions of the bill." Prior to 1984, the long-standing rule governing the governor's sectional veto power was that the governor could only use the executive veto power in a "negative" manner, and not in an "affirmative" manner. Wash. Fed'n of State Employees, AFL-CIO, Council 28 AFSCME v. State, 101 Wn.2d 536, 545, 682 P.2d 869 (1984). Phrased another way,

> "[T]he Governor may use the veto power to prevent some act or part of an act of the legislature from becoming law. Likewise, the Governor may not use the veto power to reach a new or different result from what the legislature intended. In other words, the veto power must be exercised in a destructive and not a creative manner."

State Employees, 101 Wn.2d at 545 (alteration in original) (quoting Wash. Ass'n of Apartment Ass'ns v. Evans, 88 Wn.2d 563, 565-66, 564 P.2d 788 (1977)).

In State Employees, the Supreme Court disavowed that rule, holding that, "[i]ts use by the judiciary is an intrusion into the legislative branch, contrary to the separation of powers doctrine, and substitutes judicial judgment for the judgment of the legislative branch." 101 Wn.2d at 546 (citations omitted). From then on, "[t]he Governor [was] free to veto 'one or more sections or appropriation items', without judicial review." State Employees, 101 Wn.2d at 547. Thus, the current analytical approach is that the governor is free to veto sections of a bill even

when doing so changes the meaning of the bill from that which the legislature originally intended.

Significantly, the Supreme Court characterized the veto process as follows:

> "In approving or disapproving legislation, the Governor acts in a legislative capacity and as part of the legislative branch of government." Hallin v. Trent, 94 Wn.2d 671, 677, 619 P.2d 357 (1980). In effect, the Governor holds one-third of the votes. The veto is upheld if the Legislature fails to override it. Fain v. Chapman, 94 Wn.2d 684, 688, 619 P.2d 353 (1980). To override the Governor's veto, the Senate and House must agree by a two-thirds vote. Const. art. 3, § 12 (amend. 62).

State Employees, 101 Wn.2d at 544. The legislature's power to override, the Supreme Court held, serves as an adequate "check" on the governor's veto power. State Employees, 101 Wn.2d at 547. Thus, if the legislature disapproves of the new meaning or effect of the bill resulting from the governor's veto, it can vote to override the veto and restore the bill to its original meaning or effect.

Here, Governor Gregoire vetoed 36 of the 58 sections of ESSSB 5073. This veto significantly altered the meaning and effect of the sections that remained for enactment. When returning the bill to the Senate, the governor provided a formal veto message expressing her opinion as to the meaning and effect of the bill after her veto. See Wash. State Grange v. Locke, 153 Wn.2d 475, 490, 105 P.3d 9 (2005) ("The expression of [an opinion as to the statute's interpretation] is within the governor's prerogative.") Had the legislature objected to the governor's veto, it could have overturned it by a two-thirds vote. CONST.

art. III, § 12. A legislative override would also have nullified the governor's veto message. By not overriding the veto, the legislature failed to provide an interpretation of the MUCA contrary to that articulated by Governor Gregoire. Cf. Rozner v. City of Bellevue, 116 Wn.2d 342, 349, 804 P.2d 24 (1991) (legislature's actions in not overriding veto, but later amending parts of the statute, functioned as legislative approval of governor's veto message with respect to unamended portions of the statute).

All parties urge us to consider the intent of the legislature in passing ESSSB 5073. However, ESSSB 5073, as passed by both houses of the legislature, was not the bill that was enacted. Rather, the bill that was enacted was that which existed after the governor's veto. Thus, the governor's veto message is the only legislative history that speaks directly to the law as it was enacted. It is the paramount source for us to refer to in order to discern the legislative intent behind the enacted law.

The governor's intent in vetoing a significant portion of ESSSB 5073 was that there should not be a state registry, and that medical marijuana should not be legalized. In her veto message, Governor Gregoire stated:

> *I have been open, and remain open, to legislation to exempt qualifying patients and their designated providers from state criminal penalties* when they join in nonprofit cooperative organizations to share responsibility for producing, processing and dispensing cannabis for medical use. Such exemption from criminal penalties should be conditioned on compliance with local government location and health and safety specifications.

LAWS OF 2011, ch. 181, governor's veto message at 1376 (emphasis added). By stating that she was open to future legislation that would exempt patients from

criminal penalties, the governor indicated that she did not read *this* bill as creating any such exemptions.

> Further, the governor concluded her veto message by stating:

> I am not vetoing Sections 402 or 406, which establish affirmative defenses for a qualifying patient or designated provider who is not registered with the registry established in section 901. Because these sections govern those who have not registered, this section is meaningful even though section 901 has been vetoed.

LAWS OF 2011, ch. 181, governor's veto message at 1376. This statement indicates that the governor realized that her veto would preclude the legislature's attempt to legalize certain medical marijuana uses. The governor affirmatively stated her understanding that only affirmative defenses to criminal prosecutions survived her veto.

These two statements, read in conjunction, demonstrate that the governor did not intend for ESSSB 5073 to legalize medical marijuana. The governor did not read the bill as enacted as exempting medical marijuana users from prosecution. Significantly, although the MUCA provides for an affirmative defense, "[a]n affirmative defense does not per se legalize an activity." State v. Fry, 168 Wn.2d 1, 10, 228 P.3d 1 (2010). Thus, the plain language of the statute, which does not read so as to legalize medical marijuana, is consonant with the governor's expressed intent in signing the bill, as amended by her vetoes.

The governor's statement regarding collective gardens does not suggest otherwise. In her veto message, Governor Gregoire stated, "Qualifying patients or their designated providers may grow cannabis for the patient's use or

participate in a collective garden without fear of state law criminal prosecutions."[14] LAWS OF 2011, ch. 181, governor's veto message at 1374-75. Two paragraphs earlier, Governor Gregoire stated, "In 1998, Washington voters made the compassionate choice to remove the fear of state criminal prosecution for patients who use medical marijuana for debilitating or terminal conditions." LAWS OF 2011, ch. 181, governor's veto message at 1374. The governor's use of the phrase "state criminal prosecution[s]" in both sentences indicates that she intended for the bill to extend the *existing* legal protections to collective gardens. The 1998 ballot initiative (I-692) provided qualifying patients with an affirmative defense to drug charges. Former RCW 69.51A.040 (1999). I-692 did not legalize medical marijuana, but the governor nevertheless described it as "remov[ing] the fear of state criminal prosecution." Her use of the same phrase when describing ESSSB 5073 must be read in this light. The governor plainly did not intend for ESSSB 5073, after her vetoes, to legalize medical marijuana. The plain language of the MUCA is consonant with the governor's expressed intent.

III

A

The Challengers nevertheless contend that the plain language of the MUCA does not allow Kent to regulate collective gardens. This is so, they assert, because RCW 69.51A.085, which deals with collective gardens, is a stand-alone statute that does not grant any regulatory authority to municipalities.

---

[14] Kent characterizes this statement as errant. As stated above, the governor was not saying that she intended to legalize marijuana. As the bill did add an affirmative defense relating to collective gardens, the governor's statement was not errant.

We disagree.

Although RCW 69.51A.085 does not itself grant powers to municipalities, this statutory provision cannot be read in isolation. "We construe an act as a whole, giving effect to all the language used. Related statutory provisions are interpreted in relation to each other and all provisions harmonized." C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wn.2d 699, 708, 985 P.2d 262 (1999) (citing State v. S.P., 110 Wn.2d 886, 890, 756 P.2d 1315 (1988)). RCW 69.51A.085 was passed as part of a comprehensive bill amending the MUCA. This provision must therefore be read in conjunction with the other enacted provisions of ESSSB 5073.

Importantly, ESSSB 5073, as enacted, includes a section specifically granting regulatory powers to municipalities. RCW 69.51A.140 states:

> *Cities and towns may adopt and enforce any of the following pertaining to the production, processing, or dispensing of cannabis or cannabis products within their jurisdiction: Zoning requirements, business licensing requirements, health and safety requirements, and business taxes.* Nothing in chapter 181, Laws of 2011 is intended to limit the authority of cities and towns to impose zoning requirements or other conditions upon licensed dispensers, so long as such requirements do not preclude the possibility of siting licensed dispensers within the jurisdiction.

(Emphasis added.) The plain language of this section allows municipalities to regulate the production, processing, and dispensing of medical marijuana. Only "licensed dispensers" are listed as users that a city may not exclude. This necessarily implies that a city retains its traditional authority to regulate

all other uses of medical marijuana.[15]  Thus, the MUCA expressly authorizes cities to enact zoning requirements to regulate or exclude collective gardens.

B

The Challengers contend that the legislative history of ESSSB 5073 does not support a reading of RCW 69.51A.140 that would allow a city to regulate or exclude collective gardens.  To the contrary, it is the Challengers' interpretation of the statute that is not supported by the legislative history.

In enacting the 2011 amendments to the MUCA, the governor provided some insight into a locality's ability to regulate medical marijuana.  In her veto message, the governor stated:

> Section 1102 sets forth local governments' authority pertaining to the production, processing or dispensing of cannabis or cannabis products within their jurisdictions.  The provisions in Section 1102 that local governments' zoning requirements cannot "preclude the possibility of siting licensed dispensers within the jurisdiction" are without meaning in light of the vetoes of sections providing for such licensed dispensers.  It is with this understanding that I approve Section 1102.

LAWS OF 2011, ch. 181, governor's veto message at 1375.  This statement indicates that the governor intended section 1102 to have meaning even though one provision therein was meaningless.  Accordingly, the governor's understanding of section 1102 of the bill was that municipalities would be able to regulate medical marijuana production, processing or dispensing within their territorial confines.

---

[15] A city's traditional authority is defined by the state constitution as the power to "make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." CONST. art. XI, § 11.

Further, the governor stated:

I have been open, and remain open, to legislation to exempt qualifying patients and their designated providers from state criminal penalties when they join in nonprofit cooperative organizations to share responsibility for producing, processing and dispensing cannabis for medical use. *Such exemption from state criminal penalties should be conditioned on compliance with local government location and health and safety specifications.*

LAWS OF 2011, ch. 181, governor's veto message at 1376 (emphasis added). "[L]ocation and health and safety specifications" are precisely what the Washington Constitution anticipates municipalities will address by enacting ordinances. "Municipalities derive their authority to enact ordinances in furtherance of the *public safety*, morals, *health* and welfare from article 11, section 11 of our state constitution." City of Tacoma v. Vance, 6 Wn. App. 785, 789, 496 P.2d 534 (1972) (emphasis added); accord Hass v. City of Kirkland, 78 Wn.2d 929, 932, 481 P.2d 9 (1971). The governor's message thus indicated her understanding that, in the future, if a bill succeeded in legalizing medical marijuana, municipalities should continue to retain their ordinary regulatory powers, such as zoning.

Nonetheless, the Challengers contend that the phrase "production, processing, or dispensing of cannabis or cannabis products" in RCW 69.51A.140 refers only to commercial production, processing, or dispensing. The Challengers' interpretation would render all of RCW 69.51A.140 a nullity. Commercial producers, processors, and dispensers are those producers, processors, and dispensers that would have been licensed by the Department of Health. ESSSB 5073, § 201(12), (13), (14). As a result of the governor's veto of

all sections creating a licensing system, commercial producers, processors, and dispensers do not exist. If "producers, processors, and dispensers" referred only to those commercial licensed entities, all of section 1102 would be meaningless. However, the governor did not veto section 1102 along with the other sections creating licensed producers, processors, and dispensers. Rather, the governor stated in her veto message that only those "provisions in Section 1102 that local governments' zoning requirements cannot 'preclude the possibility of siting licensed dispensers within the jurisdiction' are without meaning." LAWS OF 2011, ch. 181, governor's veto message at 1375. The governor's veto did not leave municipalities without the ability to regulate. In this regard, the Challengers' interpretation of the amended MUCA is contrary to the legislative history of the bill.

The governor clearly understood the bill to allow cities to use their zoning power to regulate medical marijuana use within their city limits. The governor's understanding is consistent with the plain language of the MUCA.

IV

The Challengers next contend that the Ordinance is invalid because, they assert, the MUCA preempts local regulation of medical marijuana and because the Ordinance conflicts with state law.[16] We disagree.

---

[16] The Challengers also contend that RCW 69.51A.025 precludes cities from banning collective gardens. This provision states, "Nothing in this chapter or in the rules adopted to implement it precludes a qualifying patient or designated provider from engaging in the private, unlicensed, noncommercial production, possession, transportation, delivery, or administration of cannabis for medical use as authorized under RCW 69.51A.040." RCW 69.51A.025. Contrary to the Challengers' assertion, a city zoning ordinance is not a "rule adopted to implement" the MUCA. The cited provision refers to anticipated Department of Health regulations which would

- 23 -

Generally, municipalities possess constitutional authority to enact zoning ordinances as an exercise of their police power. CONST. art. XI, § 11. However, a municipality may not enact a zoning ordinance which is either preempted by or in conflict with state law. HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs., 148 Wn.2d 451, 477, 61 P.3d 1141 (2003).

State law preempts a local ordinance when "the legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication." HJS Dev., 148 Wn.2d at 477 (citing Rabon v. City of Seattle, 135 Wn.2d 278, 289, 957 P.2d 621 (1998); Brown v. City of Yakima, 116 Wn.2d 556, 560, 807 P.2d 353 (1991)). Otherwise, municipalities will have concurrent jurisdiction over the subject matter. HJS Dev., 148 Wn.2d at 477. The MUCA does not express the intent to preempt the field of medical marijuana regulation. To the contrary, as previously discussed in section III, the MUCA explicitly recognizes a role for municipalities in medical marijuana regulation. As the MUCA explicitly contemplates its creation, the Ordinance is not directly preempted by state law.

A local ordinance that is not directly preempted may nevertheless be invalid if it conflicts with state law. Pursuant to article XI, section 11 of the Washington Constitution, "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." A city ordinance is unconstitutional under

---

have been adopted as rules contained within the Washington Administrative Code, had the governor not vetoed the regulatory scheme.

article XI, section 11 if "(1) the ordinance conflicts with some general law; (2) the ordinance is not a reasonable exercise of the city's police power; or (3) the subject matter of the ordinance is not local." Edmonds Shopping Ctr. Assocs. v. City of Edmonds, 117 Wn. App. 344, 351, 71 P.3d 233 (2003). Whether a local ordinance is valid under the state constitution is a pure question of law, which this court reviews de novo. Edmonds Shopping Ctr., 117 Wn. App. at 351.

Here, the Challengers contend that the Ordinance is unconstitutional because it conflicts with the MUCA.[17] Ordinances are presumed to be constitutional. HJS Dev., 148 Wn.2d at 477. As the party challenging the Ordinance, the burden is on the Challengers to prove beyond a reasonable doubt that it is unconstitutional. Edmonds Shopping Ctr., 117 Wn. App. at 355. "'In determining whether an ordinance is in "conflict" with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.'" City of Tacoma v. Luvene, 118 Wn.2d 826, 834-35, 827 P.2d 1374 (1992) (internal quotation marks omitted) (quoting City of Bellingham v. Schampera, 57 Wn.2d 106, 111, 356 P.2d 292 (1960)). "The conflict must be direct and irreconcilable with the statute, and the ordinance must yield to the statute if the two cannot be harmonized." Luvene, 118 Wn.2d at 835.

"The scope of [a municipality's] police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people." State v. City of Seattle, 94 Wn.2d 162, 165, 615 P.2d 461 (1980). Generally speaking, a municipality's police powers are

_____

[17] The Challengers do not contend that the Ordinance is unreasonable or not local.

coextensive with those possessed by the State. City of Seattle, 94 Wn.2d at 165. Without question, a municipality's plenary powers include the power to "enact ordinances prohibiting and punishing the same acts which constitute an offense under state laws." Schampera, 57 Wn.2d at 109; accord State v. Kirwin, 165 Wn.2d 818, 826-27, 203 P.3d 1044 (2009). As the plain language of the statute and the governor's veto message indicate, collective gardens are not legal activity. The Ordinance, by prohibiting collective gardens, prohibits an activity that constitutes an offense under state law. As it prohibits an activity that is also prohibited under state law, the Ordinance does not conflict with the MUCA.[18] The trial court did not err by so holding.[19]

Affirmed.

We concur:

---

[18] To decide this case, we need not determine whether the Ordinance would be valid had the MUCA actually legalized medical marijuana. Therefore, we decline to further address this subject.

[19] The Challengers additionally assert that the trial court erred by issuing a permanent injunction against them. We review the trial court's decision to grant a permanent injunction for an abuse of discretion. Wash. Fed'n of State Emps. v. State, 99 Wn.2d 878, 887, 665 P.2d 1337 (1983). "A party seeking an injunction must show (1) a clear legal or equitable right, (2) a well-grounded fear of immediate invasion of that right, and (3) actual and substantial injury as a result." Resident Action Council v. Seattle Hous. Auth., 177 Wn.2d 417, 445-46, 300 P.3d 376 (2013). In their pleadings, each plaintiff expressed an intention to violate Kent's ordinance. Thus, the trial court did not abuse its discretion by granting the injunction.